1

1    UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF INDIANA
2    HAMMOND DIVISION

3    ────────────────────────────  ] DOCKET NO: 2:99-CR-84(1)RL
     UNITED STATES OF AMERICA,     ]
4                                  ]
                     PLAINTIFF,    ]
5                                  ]
                VS.                ] HAMMOND, INDIANA
6                                  ] MONDAY, AUGUST 30, 1999
     ROGER TAYLOR,                 ] 3:10 - 5:30 P.M.
7                                  ]
                 DEFENDANT.        ] SUPPRESSION HEARING
8    ────────────────────────────  ] PAGES 1-92

9                TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE RUDY LOZANO
10           UNITED STATES DISTRICT COURT JUDGE

11   APPEARANCES:

12   FOR THE PLAINTIFF:          DAVID A. CAPP
                                 UNITED STATES ATTORNEY, By
13                               D. DOUG PETROVIC,
                                 Assistant U.S. Attorney
14                               1001 Main Street, Suite A
                                 Dyer, Indiana  46311
15                               (219) 322-8576

16   FOR THE DEFENDANT:          JEFFREY SCHLESINGER
                                 Attorney at Law
17                               One Professional Center
                                 Suite 306
18                               Crown Point, Indiana 46307
                                 (219) 663-3197
19
     ALSO PRESENT:               ANTHONY T. RIEDLINGER, FBI,
20                               Case Agent

21

22

23

24
     JULIE A. CHURCHILL, OFFICIAL COURT REPORTER, U.S. COURTHOUSE
25      507 STATE STREET, ROOM 217 HAMMOND, INDIANA   46320
                 (219) 937-5310; FAX (219) 937-5200

2

1          MONDAY, AUGUST 30, 1999 SUPPRESSION HEARING - I N D E X

2

3     WITNESSES:                     PAGE    LINE
          ROGER TAYLOR

4     Direct by Mr. Schlesinger ....... 4      16
      Cross by Mr. Petrovic .......... 18       7
5
          ANTHONY T. RIEDLINGER
6
      Direct by Mr. Petrovic ........ 31       6
7     Cross by Mr. Schlesinger ....... 45      13

8         TERRY LEE

9     Direct by Mr. Petrovic ........ 62       3
      Cross by Mr. Schlesinger ....... 67      7
10
          JAMES A. REEDER
11
      Direct by Mr. Petrovic ........ 75       7
12    Cross by Mr. Schlesinger ....... 78      1

13
                              EXHIBITS ADMITTED
14                            PAGE    LINE
      Government Ex. 1 ............... 35       9
15

16

17

18

19

20

21

22

23

24

25

3

1               MONDAY, AUGUST 30, 1999, 3:10 P.M.

2          THE COURT:  This is the case of the United States of

3  America verses Roger Taylor, Hammond Criminal Number 2:99-CR-48

4  The defendant is present in person and with his attorney

5  Mr. Jeffrey Schlesinger.  The government is represented by its

6  Assistant United States Attorney Mr. Doug Petrovic.  We are

7  here for a motion to suppress filed by the defendant.  Counsel,

8  are there going to be any witnesses?

9          MR. PETROVIC:  Yes, your Honor.  Three on behalf of

10 the government.

11         MR. SCHLESSINGER:  One on behalf of the defendant.

12 How long do you think they're going to take, being reasonable,

13 on examination?

14         MR. SCHLESINGER:  Probably 25 minutes to an hour.

15 Maybe a half hour.

16         MR. PETROVIC:  I could do mine in a half hour, all

17 three.

18      (The Court addresses counsel in the spectator section

19       waiting for a different case.)

20         THE COURT:  Mr. Schlesinger it is your motion.

21         MR. SCHLESINGER:  I'd like to more for separation of

22 witnesses.

23         THE COURT:  All witnesses are to remain outside of

24 the courtroom except when testifying.  Neither the attorneys or

25 any of the spectators are to talk to witnesses.

4

Taylor-Direct-Schlesinger

1      MR. SCHLESINGER:  I would call Roger Taylor, your

2  Honor.

3      THE COURT:  You may.

4      Sir, please come to the witness stand right here, and

5  when you arrive, turn and face me and I'll swear you in.

6      (Witness sworn in.)

7      THE DEFENDANT:  I do.

8      THE COURT:  Please be seated.  Pull your chair up,

9  speak directly into the microphone, loud enough so that

10 everybody in the courtroom may hear.

11     Mr. Schlesinger, you may proceed when you're ready.

12     MR. SCHLESINGER:  Thank you, your Honor.

13                  ROGER TAYLOR,

14 called as a witness by the Defense herein, having been first

15 duly sworn, was examined and testified as follows:

16                DIRECT EXAMINATION

17 BY MR. SCHLESINGER:

18 Q.   Please state your name, sir.

19 A.   Roger Taylor.

20 Q.   And what's your birth date?

21 A.   Fourth month, 1962.

22     COURT REPORTER:  Please say that again.

23     THE WITNESS:  Fourth month, 1962.

24 BY MR. SCHLESINGER:

25 Q.   April of 1962?

5

Taylor-Direct-Schlesinger

1   A.   Yes.

2   Q.   So you're 37 years old, today?

3   A.   Yes.

4   Q.   Were you arrested on May 5th of 1999?

5   A.   Yes.

6   Q.   And where were you when you were arrested?

7   A.   At 4047 Fillmore.

8   Q.   And what city is that in?

9   A.   Gary, Indiana.

10  Q.   Did you own that residence?

11  A.   No, I did not.

12  Q.   Were you a tenant in that residence?

13  A.   No.

14  Q.   What were you doing in that residence, prior to your

15  arrest?

16  A.   I was working on a car, putting brake shoes on a car.

17  Q.   Was anyone else at the residence at the time of your

18  arrest?

19  A.   Yeah, there were several other people there.

20  Q.   Do you know the names of any of the people who were

21  present?

22  A.   The other three guys that I was arrested with and several

23  more other people, I don't really know their names.

24  Q.   There were people arrested at the same time you were?

25  A.   Yes, there was three.

6

Taylor-Direct-Schlesinger

1    Q.    Did you know their names?

2    A.    Yeah, Jermaine, Shun and Robert.

3    Q.    Do you know their last names?

4    A.    Jermaine Carr, Shun Drayton and Robert Gardner.

5    Q.    Did -- what had you been doing in the day prior to the

6    time you were arrested?

7    A.    I was just playing basketball, and I had did a little

8    heroin that day and what not.

9    Q.    Okay.  At what time did you do the heroin?

10   A.    Earlier that day, about 10:00 o'clock.

11   Q.    And how did you do the heroin?

12   A.    I snorted it.

13   Q.    Are you addicted to heroin?

14   A.    Yes, I was.

15   Q.    And how long had you had an addiction to heroin prior to

16   May 5th of 1999?

17   A.    About two-and-a-half years.

18   Q.    During the time of your addiction, would you use heroin

19   every day?

20   A.    Yes.

21   Q.    Did you always snort it?

22   A.    Yes.

23   Q.    Had you done any heroin after 10:00 A.M. on May 5th of

24   1999?

25   A.    I had done a small amount about 1:00 o'clock.

7

Taylor-Direct-Schlesinger

1   Q.   In the afternoon?

2   A.   Yes.

3   Q.   And had you drunk any alcohol in that day?

4   A.   Yes, I had drunk a beer.  I think I drunk one beer.

5   Q.   Okay.  About what time did you drink the beer?

6   A.   About 1:00, at the same time.

7   Q.   Okay.  About what time were you arrested?

8   A.   At 5:00.  I think it was 5:00 o'clock.

9   Q.   5:00 o'clock p.m.?

10  A.   Yes.

11  Q.   It was still light out when you were arrested?

12  A.   Yes.

13  Q.   Could you still feel the effects of the marijuana at the

14  time you were arrested?

15  A.   Not really, cause it -- some of the drugs, you know, when

16  you get arrested, you're spooked.

17  Q.   Could you still feel the effects of the heroin at the

18  time?

19  A.   No, it was wearing off at the time.

20  Q.   And you were not under the influence of alcohol at the

21  time you were arrested?

22  A.   No.

23  Q.   Who arrested you?

24  A.   GRIT Task Force.

25  Q.   Okay.  And the GRIT Task Force are agents from -- or GRIT

8

Taylor-Direct-Schlesinger

1  agents who may have been federal agents or state agents, is

2  that --

3  A.   The FBI, I guess.

4  Q.   Okay.  And how were the people who arrested you dressed?

5  A.   They was all dressed up in black body armour and all that.

6  Q.   Did they have helmets on?

7  A.   Yes.

8  Q.   Did they have weapons?

9  A.   Yes.

10  Q.   And what type of weapons did they have?

11  A.   All different kind of weapons.

12  Q.   Well, did they have pistols, rifles or did it depend on

13  the different officer?

14  A.   I couldn't really tell you, because they made us all get

15  down.  I couldn't really see.

16  Q.   How many were there?

17  A.   About 35 or 40 of them.

18  Q.   You think there were 35 or 40 officers?

19  A.   At least.  At least.

20  Q.   And they ordered you to get down on the ground?

21  A.   Yes.

22  Q.   Did you do so?

23  A.   Yes.

24  Q.   Were the people with you ordered down on the ground?

25  A.   Yes.

9

Taylor-Direct-Schlesinger

1  Q.   And what position were you in when you were down on the
2  ground?
3  A.   I was laying on my stomach.
4  Q.   And that's the way you were instructed to lie?
5  A.   Yes.
6  Q.   Were you instructed to hold your hands out over your head?
7  A.   Put my hands on my head.
8  Q.   How long did you lie in that position?
9  A.   For at least 35 or 40 minutes.  It could have been longer.
10  Q.   Do you have any idea what the officers did while you were
11  in that position?
12  A.   They was turning me backwards and forwards, searching me
13  and seeing if I had anything on me at the time.
14  Q.   Okay.  Were they searching you for the entire 35 minutes?
15  A.   Yes.  They was putting all of us back and forth, searching
16  us.
17  Q.   Okay.  And did they find anything on you?
18  A.   No.
19  Q.   Was there ever a period of time during that time that they
20  just left you alone on the ground?
21  A.   Yes.  And they went in the house and searched the house.
22  Q.   Okay.  And you remained on the ground during that time?
23  A.   Yes.
24  Q.   What happened after they finished searching you, after the
25  35 minutes passed?

Taylor-Direct-Schlesinger

1   A.   We was taken down to GRIT headquarters, I think.  Yeah,

2   GRIT headquarters.

3   Q.   Okay.  And where is GRIT headquarters?

4   A.   On Fifth -- Fifth Avenue.

5   Q.   Is that in the City of Gary, Indiana?

6   A.   Yes.  Behind the bank building.

7   Q.   How were you transported to GRIT headquarters?

8   A.   In a van.

9   Q.   Were you with anyone else who was arrested, or were you by

10  yourself?

11  A.   I was by myself.

12  Q.   And there was at least one officer with you?

13  A.   Two.

14  Q.   Two officers with you in the van?  Were they driving, or

15  was one in the back of the van?

16  A.   They was both in the front, and I was in the back by

17  myself.

18  Q.   Were did they take you when they got to GRIT headquarters?

19  A.   In a room.

20  Q.   Okay.  And can you describe this room to the Court?

21  A.   It's a regular room, like a law office.  And they just

22  left me in there until they questioned the other people.

23  Q.   Okay.  Were there any windows in the room?

24  A.   No.

25  Q.   How big is the room?

11

Taylor-Direct-Schlesinger

1   A.   I couldn't -- maybe about 12 by 12, something like that.

2   Q.   12 by 12, you say?

3   A.   If that big.

4   Q.   You didn't measure it out?

5   A.   No.

6   Q.   So, it's approximately 12 by 12?

7   A.   Yes.

8   Q.   Were you alone in the room, or was somebody with you?

9   A.   I was alone.

10  Q.   And were you secured in any manner?

11  A.   No.

12  Q.   You did not have handcuffs on?

13  A.   No.

14  Q.   Okay.  Was there anything in the room with you?

15  A.   A typewriter, a computer and stuff like that, a telephone.

16  Q.   And I take it there was a desk with these items on it?

17  A.   Yes.

18  Q.   And you were sitting in a chair?

19  A.   Yes.

20  Q.   Was there another chair with the desk?

21  A.   In back of the desk.

22  Q.   Anything else in the room that you recall?

23  A.   No, not really.

24  Q.   How long were you in the room before anybody came in to

25  talk with you?

Taylor-Direct-Schlesinger

1  A.   At least 25, 30 minutes -- maybe 35, 40 minutes at the

2  most.

3  Q.   Okay.  25 to 40 minutes, would that be your estimate?

4  A.   Yes, uh-huh.

5  Q.   When somebody came into talk to you, who came in to talk

6  to you?

7  A.   A GRIT agent.

8  Q.   Okay.  One agent by himself?

9  A.   No, it was two.

10  Q.   And can you describe the agents who came in to speak to

11  you?

12  A.   One was a white guy that had a red beard.  And the other

13  one was a black guy, big guy.  I don't know their names.

14  Q.   Okay.  There was one white agent and one black agent?

15  A.   Yeah.

16  Q.   And they identified themselves as being GRIT agents?

17  A.   Yes.

18  Q.   Did they tell you what you were charged with?

19  A.   No, I wasn't charged with anything.  They just asked me to

20  tell them some, you know, -- you know, they'd let me go if I

21  tell them something, which one of the guys was selling, you

22  know, crack out of the house.  And I told them I had no idea,

23  you know, of that nature.

24  Q.   Okay.  Did you tell them anything at that time?

25  A.   No.

13

Taylor-Direct-Schlesinger

1   Q.   Did they say anything else to you?

2   A.   Yeah.  They asked me for a statement.

3   Q.   What did they want -- did they indicate what they wanted

4   the statement about?

5   A.   Yeah.  They wanted me to tell which one of the guys was

6   selling crack, or did Robert Gardner go pick up some crack and

7   bring it back?  And I told them I didn't know.

8   Q.   Did they indicate what might happen --

9           THE COURT:  Hold on, Mr. Schlesinger.

10          (Brief interruption.)

11          THE COURT:  Okay.  Go ahead.

12  BY MR. SCHLESINGER:

13  Q.   Did they indicate what might happen if you refused to give

14  those statements?

15  A.   Yeah.  He said he would send me over to the MCC for seven

16  to ten years, if I didn't give him any information.

17  Q.   Do you remember which agent said that?

18  A.   The one with the red beard.

19  Q.   Did he say why you would be sent to the MCC for seven to

20  ten years?

21  A.   Because I wouldn't give him any information about, you

22  know, which one of the guys was selling.

23  Q.   What happened after that?

24  A.   Nothing.  He went and questioned one of the other guys.

25  Q.   Were you left alone in the room?

14

Taylor-Direct-Schlesinger

1   A.   Yes.

2   Q.   And you did not see him question anybody else?

3   A.   No.

4   Q.   You're assuming that because they left the room, they were

5   talking to somebody else?

6   A.   Yes.  I heard a conversation going on, but I couldn't

7   really hear what it was going on about.

8   Q.   How long -- at this time, had anyone advised you of your

9   constitutional rights?

10  A.   No, I hadn't heard anything on that.

11  Q.   How long were you alone for?

12  A.   About 20 minutes, at least 20 minutes.

13  Q.   And then did someone come back to the room?

14  A.   Yes.

15  Q.   Who came back?

16  A.   The guy with the red beard and another white guy that wore

17  glasses.

18  Q.   Had you had anything to drink since you've been at GRIT

19  headquarters?

20  A.   No.

21  Q.   Had you had anything to eat since that time?

22  A.   No.

23  Q.   Did you tell any of the officers about your heroin

24  addiction?

25  A.   Yes.

Taylor-Direct-Schlesinger

1   Q.   What did you say?

2   A.   I told them I was withdrawing on heroin, that I needed

3   medical attention.

4   Q.   Okay.  Did you do that to the white officer and the black

5   officer the first time they were in?

6   A.   Yes, I did.  Yes, I did.

7   Q.   Okay.  What was their response, if anything?

8   A.   They told me to make a statement and then, you know, they

9   would give me medical attention.

10  Q.   What did the officers say when the two officers returned?

11  A.   They asked me for a statement, and then they asked me --

12  well, then he was telling me something that the other guys had

13  said.  And I told them I had no knowledge to it.

14  Q.   And did they tell you to give them a statement the second

15  time?

16  A.   Yes.  And he was constantly writing things down that

17  wasn't true.

18  Q.   Okay.  Who was writing down, the agent with the red beard

19  or --

20  A.   Yes.

21  Q.   He wrote things down?

22  A.   Yes.

23  Q.   Were you advised of your constitutional rights the second

24  time?

25  A.   I couldn't recall if he --

Taylor-Direct-Schlesinger

1        (Brief interruption.)

2            MR. SCHLESINGER:  Hold it, we're off the record.

3            Now, I forgot the question.  Oh, I think I can ask

4    the question.

5    BY MR. SCHLESINGER:

6    Q.   Were you advised of your constitutional rights the second

7    time?

8    A.   I think I recall they did ask me did I want to sign a

9    paper for my rights.  And I told them I didn't want to sign

10   anything.

11   Q.   Did they advise you of your rights?

12   A.   No, I never did get them.

13   Q.   How long were they with you the second time before they

14   stopped questioning you?

15   A.   Thirty minutes, at least.

16   Q.   Did they make any other attempts to question you that

17   evening?

18   A.   No, they just held us there until about 1:30, 2:00 o'clock

19   and took us to 13th and Broadway, to the Gary Police station.

20   Q.   Were you alone in the room until 1:30, if you recall?

21   A.   Yes.

22   Q.   Okay.  Were you handcuffed at any time while you were in

23   the room?

24   A.   No.

25   Q.   And you were transported to the police station?

17

Taylor-Direct-Schlesinger

1   A.   Yes.

2   Q.   Were you ever given medical attention?

3   A.   No.

4   Q.   How about after you arrived at the Gary Police station?

5   A.   No.

6   Q.   Okay.  Were you given medical attention at all the next

7   day?

8   A.   Yes, it was about 11:30, 12:00 o'clock.

9   Q.   In the morning?

10  A.   Yes.

11  Q.   Okay.  And where did you get the medical attention?

12  A.   In St. Mary Hospital in Hammond.

13  Q.   If I were to tell you the hospital in Hammond is called

14  St. Margaret, would that be correct?

15  A.   I imagine so.  That was my first time I ever attended a

16  hospital.

17  Q.   It was in Hammond and it was a hospital?

18  A.   Yes, in Hammond.

19  Q.   And what did they do to you at the hospital?

20  A.   They checked me out and gave me a patch, a medical patch

21  for heroin.

22  Q.   To ease your withdrawal symptoms?

23  A.   Yes.

24  Q.   And were you taken back to Gary jail then after?

25  A.   No, I was brought over here to Court.

18

Taylor-Cross-Petrovic

1  Q.    The next morning?

2  A.    Yes.

3  Q.    Was it after noon then the next day?

4  A.    Yes.

5          MR. SCHLESINGER:  I have no other questions, Judge.

6          THE COURT:  Cross?

7                      CROSS-EXAMINATION

8  BY MR. PETROVIC:

9  Q.    Sir, you indicated that you had been working on someone's

10 vehicle?

11 A.    Yes.

12 Q.    Who's vehicle was it?

13 A.    Jermaine Carr.

14 Q.    Jermaine Carr?

15 A.    Yeah.

16 Q.    How did you know Jermaine Carr?

17 A.    I met him about three, four months -- I mean, prior to the

18 fact.

19 Q.    You met him three or four months?

20 A.    Yeah.

21 Q.    Where was he staying at?

22         MR. SCHLESINGER:  Objection, your Honor.  Relevance

23 and I think it's beyond the scope of my direct examination.

24         THE COURT:  Overruled.  You may answer.

25         THE WITNESS:  Well, I think he was staying at Fifth

Taylor-Cross-Petrovic

1    and Van Buren.

2    BY MR. PETROVIC:

3    Q.    He wasn't staying at 447 Fillmore?

4    A.    No, he wasn't.

5    Q.    Did he ever visit that home?

6    A.    Yes, he was there that day.

7    Q.    Why were you fixing his car there?

8    A.    Because that's where he had his car at that time.

9    Q.    So you knew him for three or four months?

10   A.    Yes.

11   Q.    When did you start working on his car that day?

12   A.    Approximately, about 1:30, 2:00 o'clock.

13   Q.    Where had you come from?

14   A.    I came from my house, and I came from across the street to

15   shoot basketball.

16   Q.    You had been shooting basketball across the street?

17   A.    Yes.

18   Q.    How long had you been playing basketball across the

19   street?

20   A.    From about 10:30 to about 1:00.

21   Q.    So you had been playing basketball for approximately

22   two-and-a-half, three hours?

23   A.    Yes.

24   Q.    You indicated the other three individuals who were

25   arrested were Jermaine Carr, Robert Gardner and Shun Drayton,

Taylor-Cross-Petrovic

1  correct?

2  A.    Yes.

3  Q.    How did you know Shun Drayton and Robert Carr -- Gardner,

4  excuse me.

5  A.    Robert Gardner was like a little brother to me.  He didn't

6  -- and that was the reason for him to come by, he was looking

7  for me.  My mother had told him that I was over there working,

8  and he came by looking for me.  Shun, I had met him through one

9  of my cousins.

10 Q.    So, you knew both of them?

11 A.    Yes.

12 Q.    And is Robert Gardner actually related to you?

13 A.    No, he's like a little brother to me.

14 Q.    And Shun Drayton, you indicated you knew him through a

15 cousin?

16 A.    Yes.  He had cut my hair a couple of times.

17 Q.    And who else was playing basketball with you that day?

18 A.    It would be a lot of people in the neighborhood.  I have a

19 lot of people that I play basketball with.  They come from all

20 over.

21 Q.    Was Shun Drayton playing basketball with you?

22 A.    No.  He was the one that I had called from the front to

23 the back, he helped me put the brakes on.

24 Q.    Had he helped you with vehicles previously?

25 A.    Yes.

Taylor-Cross-Petrovic

1    Q.    And how about Robert Gardner, had he played basketball

2    with you that morning?

3    A.    No.

4    Q.    And had Jermaine Carr played basketball with you that

5    morning?

6    A.    No.

7    Q.    So you played basketball for approximately two-and-a-half,

8    three hours?

9    A.    Yes.

10   Q.    And at 1:00 p.m. you had one beer?

11   A.    I guess.

12   Q.    And what else did you have?

13   A.    I snorted a little bit of heroin, maybe two lines.

14   Q.    And how much did you snort that morning?

15   A.    A half a bag, maybe a half a dime.

16   Q.    Half a bag?

17   A.    Yes.

18   Q.    How many lines is that?

19   A.    Probably, two or three.

20   Q.    So about the same amount?

21   A.    Yes.

22   Q.    And where did you get that heroin?

23   A.    I beg your pardon?

24   Q.    Where did you get that heroin?

25            MR. SCHLESINGER:   Objection, your Honor, relevance.

22

Taylor-Cross-Petrovic

1    THE COURT:  Why is it relevant, Counsel?  This isn't
2  in the discovery of --
3    MR. PETROVIC:  I want to know if he associated with
4  the other individuals.
5    THE COURT:  Why is that relevant to the Motion to
6  Suppress?
7    MR. PETROVIC:  They were all in there when they came
8  into this house, at the residence.
9    THE COURT:  The Motion to Suppress, from what I hear,
10  on the basis that he wasn't competent at the time to give a
11  waiver.  What difference does it make who else was in the
12  house?  That's for the trial, not for the purposes of this
13  hearing.  Sustained.
14  BY MR. PETROVIC:
15  Q.  You indicated, unless I misunderstood -- did you have
16  marijuana at some part of this day?
17  A.  Yes.
18  Q.  When was that?
19  A.  Approximately, right before they came and arrested us at
20  447 Fillmore.
21  Q.  How long before you were arrested?
22  A.  What, that I had the marijuana?
23  Q.  Yes.
24  A.  Maybe 20 minutes before they even came in.  Cause I had
25  came out the back and washed my hands, and I was sitting down

23

Taylor-Cross-Petrovic

1   smoking a joint.

2   Q.   And what time did you indicate -- do you recall the exact

3   time of the search warrant?

4   A.   I never did see a search warrant.

5   Q.   Do you recall when GRIT arrived at that residence?

6   A.   Well, I thought it was about 5:00 o'clock.  Approximately

7   5:00 o'clock.

8   Q.   You're not sure?

9   A.   No.

10   Q.   When counsel asked you concerning your heroin that day

11   that you took in, you indicated it was wearing off by the time

12   that search warrant was executed?

13   A.   Yes, because I know I didn't take my normal dose, what I

14   normally take.

15   Q.   So what does that mean to you that you're -- that the

16   heroin was wearing off?

17   A.   That's when you go to withdrawal.

18   Q.   Okay.  And how do you feel at that time?

19   A.   Your eyes run, your back aches, you know, your bones,

20   you're not generally yourself.

21   Q.   Are you able to think?

22   A.   Not too swell.

23   Q.   Are you able to remember?

24   A.   Yes, um-hum, I'm able to remember.

25   Q.   You're able to remember everything that happened that day?

24

Taylor-Cross-Petrovic

1   A.   Just about.

2   Q.   You indicated there were as many as 40 agents that day?

3   A.   There was so many people out there, I don't know.  I'm

4   just estimating about 40.

5   Q.   And that you were searched approximately 35 to 40 minutes

6   while you were on the ground?

7   A.   Maybe.  I mean, it was a long time.  I'm just estimating

8   time.  I don't really know.

9   Q.   You indicated when you got back to GRIT headquarters, you

10  were in a room 12 by 12, approximately?

11  A.   I don't know how big the room were or anything of that

12  nature.  I was just estimating, you know, since you keep going

13  on about that.  I don't really know how big it was, it was just

14  a room.

15  Q.   Did you have any space to move around inside the room?

16  A.   I didn't move around because they asked me not to.

17  Q.   And you didn't have any handcuffs on you?

18  A.   No.

19  Q.   You indicated that one of the individuals said that you

20  would go to jail for seven to ten years, if --

21  A.   If I didn't give up any information towards any of the

22  other guys.  He said if you have anything on them, just give

23  them the information on one of the guys and he would let me go.

24  And I told him I didn't know anything.

25  Q.   Any he never told you what you were charged with?

Taylor-Cross-Petrovic

1    A.    No.  I don't recall them saying anything about, you know,
2    this and that or whatever.
3    Q.    You initially indicated that there were two individuals
4    that came into the room, one a black male, and the other one a
5    white male?
6    A.    Yes.
7    Q.    And which one questioned you?
8    A.    The white male.
9    Q.    And at no time did he go over your constitutional rights?
10   A.    I don't recall him going over my constitutional rights.
11   Q.    Do you ever recall, when he sat down with you -- how long
12   would you say after -- from the time that GRIT executed the
13   search warrant that he actually sat down with you?  How long?
14            If I said two to three hours?
15   A.    I don't think he stayed in the room with me that long,
16   cause he started questioning other people.
17   Q.    How long after you were initially arrested, right in the
18   officers hand, did you go to GRIT?  How long after that; an
19   hour?  More?  Less?
20   A.    I think it was about an hour or so, because we was out a
21   long time.  It was just about to get dark.
22   Q.    And once you arrived at GRIT, how long was it that you sat
23   in the room until they began questioning you?
24   A.    I couldn't really tell you.
25   Q.    An hour or two?

26

Taylor-Cross-Petrovic

1   A.   No, it couldn't have been that long.

2   Q.   So, from the time you were actually arrested, from the

3   moment you were arrested, you were questioned within three

4   hours?

5   A.   Yeah, probably, yeah.

6   Q.   And when you were initially questioned by the white and

7   the black gentlemen, did you ever sign anything?

8   A.   I have no idea about signing nothing.  I told them I

9   didn't want to sign anything.

10  Q.   Did you sign anything?

11  A.   I don't recall signing anything.

12  Q.   You indicated that the first time the two individuals came

13  in, they were in the room for how long, a half hour?

14  A.   It could have been about that long.  Because they didn't

15  have a clock in the room I was in, I'm just estimating time. I

16  don't know.

17  Q.   And then they left for how long?

18  A.   About the same length of time, and then they came back.

19  And it was two different guys.

20  Q.   And this time it was two white individuals?

21  A.   Yes.

22  Q.   And this time they stayed 30 minutes?

23  A.   It could have been that long, or longer.

24  Q.   And did these two white individuals leave and come back

25  again, or was this the last they questioned you?

27

Taylor-Cross-Petrovic

1  A.   That was the last they questioned me.

2  Q.   So, you were questioned two times; one, a black and white

3  individual, the second time, two white individuals?

4  A.   Yeah, I think that's what it was.  Yeah.

5  Q.   And when exactly did you ask for a medical attention?

6  A.   When they came in and asked me questions the first time.

7  Q.   And what was their reply?

8  A.   They said I'd get medical attention as soon as I make a

9  statement.

10  Q.   And did they ever ask you to sign a statement?

11  A.   Yeah, and I told them, no, I wasn't going to sign

12  anything.  Because what they was writing down wasn't what I

13  said.

14  Q.   You told them it wasn't the truth?

15  A.   No, it wasn't that it wasn't the truth, it wasn't what

16  came out of my mouth.

17  Q.   So, what they wrote down on the piece of paper --

18  A.   It's what they wanted to put on the paper.  That's what it

19  was.

20  Q.   And not what came out of your mouth?

21  A.   Exactly.  After I read -- they read back to me, it's what

22  they wanted to put on the paper.

23  Q.   And that wasn't what you said?

24  A.   No.

25  Q.   And you indicated about 1:00 o'clock that night they took

Taylor-Cross-Petrovic

1   you to the Gary Police Department?

2   A.   It could have been later than that.

3   Q.   And did you ask for medical attention there?

4   A.   Yes.

5   Q.   And who did you ask?

6   A.   I asked one of the C.O.s at the Gary Police station.  They

7   said at the time they, you know, they had to hold on us from

8   GRIT.

9   Q.   And who did you ask, do you remember the name?

10  A.   The CO, I don't know exactly which one it was.

11  Q.   Can you describe him?

12  A.   No.

13  Q.   You can't describe him?

14  A.   No.

15  Q.   And he told you no as well?

16  A.   He said he didn't have anything for me for medical

17  attention.

18  Q.   What time the next day did you go over to the hospital?

19  A.   Probably it was 11:30 or so.  Before it was time for me to

20  go to Court.

21  Q.   And who took you to the hospital?

22  A.   I think it was -- I have no idea.  It was once I got over

23  here to Court.  Then they took me over there.

24  Q.   Did any of the individuals that took you to the hospital

25  the next day before your Court hearing, were any of those

Taylor-Cross-Petrovic

1    individuals one of the ones that questioned you during the

2    night before?

3    A.   I couldn't really tell you.  I don't remember.

4    Q.   You don't remember?

5    A.   No.

6    Q.   And did anyone, from the time you were arrested to the

7    time you were turned over to the custody of the United States

8    Marshal, physically assault you in any way?

9    A.   No, I didn't get physically assaulted.  They just told me

10   if I didn't tell them any information, they was going to send

11   me to the MCC for seven to ten years.  That's the only thing,

12   there was no physical assault.

13   Q.   And --

14   A.   That's a threat.

15   Q.   Did any of the officers or agents ask if you needed

16   anything when you were in the room?

17   A.   No.

18   Q.   Never asked you?

19   A.   No.

20   Q.   Beverage, bathroom?

21   A.   No.  They was too much on the statement.

22   Q.   Do you know what Miranda Rights are, constitutional

23   rights?

24   A.   No, I don't know what they are.

25   Q.   You've never been read them before?

30

Taylor-Cross-Petrovic

1   A.   Yes, I probably have.

2   Q.   How many times?

3   A.   I don't know.  I couldn't tell you.

4   Q.   Could it be at least four or five times?

5   A.   A couple of times, probably.  A couple of times.

6            MR. PETROVIC:  Pass the witness, your Honor.

7            THE COURT:  Redirect?

8            MR. SCHLESINGER:  I have nothing further.

9            THE COURT:  You may step down.

10        (Witness excused.)

11            You may call your first witness.

12            MR. PETROVIC:  Thank you, your Honor.

13            MR. SCHLESINGER:  We have no further.

14            THE COURT:  Thank you, Mr. Schlesinger.  I'm sorry, I

15   assumed that.

16            Mr. Petrovic, I remind you that there are other

17   cases.

18            MR. PETROVIC:  Yes, your Honor.

19            THE COURT:  Sir, would you kindly come to the witness

20   stand, and when you arrive, turn and face me and I'll swear you

21   in.  Be careful, there's a step there.

22            Please raise your right hand.

23            THE WITNESS:  I do.

24            THE COURT:  Please be seated, pull your chair up,

25   speak directly into the microphone loud enough so that

31

Riedlinger-Direct-Petrovic

1   everybody in this courtroom may hear.

2          Counsel, you may proceed when you're ready.

3                    ANTHONY T. RIEDLINGER,

4   called as a witness by the Government herein, having been first

5   duly sworn, was examined and testified as follows:

6                    DIRECT EXAMINATION

7   BY MR. PETROVIC:

8   Q.   Sir, can you please state and spell your name for the

9   record.

10  A.   Anthony T. Riedlinger, R-I-E-D-L-I-N-G-E-R.

11  Q.   And with whom are you employed?

12  A.   The Federal Bureau of Investigation.

13  Q.   And how long have you been employed with that agency?

14  A.   Two-and-a-half years.

15  Q.   And for the past two and a half years were you assigned by

16  any Federal Task Force?

17  A.   I was assigned to the GRIT Task Force.

18  Q.   And how long were you with that task force?

19  A.   Approximately five months.

20  Q.   And what are some of your primary duties that you have

21  concerning GRIT?

22  A.   I was assigned to a team of investigators that

23  investigated crack house complaints.

24  Q.   And were you involved -- as part of your duties, involved

25  with an execution of a search warrant at 447 Fillmore Street,

32

Riedlinger-Direct-Petrovic

1   Gary, Indiana, on May the 5th of 1999?

2   A.   Yes, I was.

3   Q.   And how were you involved in that investigation?

4   A.   The team of investigators I was assigned to were the

5   investigative team that started the investigation of that case.

6   I assisted with the search warrant, and I was on the

7   evidentiary recovery truck.  And I also interviewed some of the

8   prisoners.

9   Q.   And what time did the search warrant on the residence at

10  447 Fillmore Street take place?

11  A.   Approximately 6:00 p.m. in the evening.

12  Q.   And approximately how many individuals are involved with

13  the actual SWAT team that goes in?

14  A.   An approximate, I would say between eight and ten.

15  Q.   And how many additional individuals were on the perimeter?

16  A.   On that night, I couldn't give you an estimate.  At least

17  ten.

18  Q.   So there were approximately ten individuals in the house,

19  and approximately ten individuals in the front?

20  A.   Yes.

21  Q.   And what role did you have right when the search warrant

22  was executed?

23  A.   I was on the evidence recovery truck.

24  Q.   And were you involved with the actual arrest of any of the

25  individuals inside the house?

33

Riedlinger-Direct-Petrovic

1   A.   No.

2   Q.   Did you search any of the individuals?

3   A.   No.

4   Q.   Do you know how long those individuals were searched?

5   A.   I can only give an approximation.  The search warrant

6   began at 6:00 p.m.  I believe they were brought out of the

7   house shortly thereafter.  So, as I said, an approximation

8   within 15 minutes they were searched.

9   Q.   And at what point in time did you go back to GRIT?

10  A.   After the search of the house was concluded.

11  Q.   And at that point in time were you involved in any

12  questioning?

13  A.   Yes, I was.

14  Q.   And whom did you question?

15  A.   I questioned Shun Drayton.  Or I believe he pronounced it

16  as Shawn and Roger Taylor.

17  Q.   And only those two individuals?

18  A.   That's correct.

19  Q.   And do you recall approximately what time you began

20  questioning Roger Taylor?

21  A.   Approximately -- I know he signed -- we read him his

22  rights, at 8:19 p.m.

23  Q.   And --

24           MR. PETROVIC:  May I approach, your Honor?

25           THE COURT:  You may.

34

Riedlinger-Direct-Petrovic

1  BY MR. PETROVIC:

2  Q.   Sir, I'm showing you what's been previously marked as

3  Government's Exhibit Number 1.  Can you take a moment to

4  examine that and tell us if you can identify that?

5       Can you recognize that item?

6  A.   Yes, it's an FD302 with an FD395 attached.

7  Q.   And what, exactly, is involved in that, the document?

8  A.   It's my narrative of the interview.  The FD395 is the

9  Miranda Advice of Rights form.

10  Q.   And when was that statement and Advice of Rights form

11  given and taken?

12  A.   The Advice of Rights form?

13  Q.   Correct.

14       THE COURT:  Counsel, this is not in evidence.

15  BY MR. PETROVIC:

16  Q.   Was that item, the Advice of Rights form, when was that

17  item received from you?  Let me strike that, that was a

18  confusing question.

19       Was an Advice of Rights form given to Roger Taylor?

20  A.   I read Mr. Taylor his rights off the FD395 form.  He then

21  signed it and then I signed it, along with another officer.

22  Q.   And is that what is contained in Government's Exhibit

23  Number 1?

24       THE COURT:  Counsel, this is not in evidence.

25       MR. PETROVIC:  I'm trying to offer it, your Honor.

Riedlinger-Direct-Petrovic

1        THE WITNESS:  It's a copy of his attached 302, yes.

2        MR. PETROVIC:  At this time, your Honor, the

3    government offers Government's Exhibit 1 into evidence.

4        THE COURT:  Any objection?

5        MR. SCHLESINGER:  Not for purposes of this hearing,

6    your Honor.

7        THE COURT:  It's admitted for purposes of this

8    hearing.

9        (Government Exhibit 1 received into evidence.)

10       THE COURT:  Now, you may ask.

11       MR. SCHLESINGER:  Excuse me, your Honor.  Are we

12   talking about the entire form now?

13       THE COURT:  Counsel, if you want to take a look at

14   Government's Exhibit 1.

15       MR. SCHLESINGER:  I believe I have a copy, I just

16   want to make sure that he is offering both pages?

17       (Both attorneys discussing exhibit.)

18       MR. SCHLESINGER:  Your Honor, I would object to the

19   entire document coming in.  The only thing that we are talking

20   about so far is the Waiver of Rights.  I see that there's

21   additional information that I don't believe that I have in

22   discovery yet, and I would need to review before commenting on

23   it.

24       MR. PETROVIC:  It's a one-page document, and it's the

25   same thing that's in the statement.  Exact same thing, there is

36

Riedlinger-Direct-Petrovic

1    nothing new in there.

2         THE COURT:  Why don't you look at it first, Counsel,

3    and then tell me if you have any objection.

4         Mr. Petrovic, you're going to owe Mr. Bauer a steak

5    dinner, I can tell that already.

6         MR. SCHLESINGER:  Sir, I'm going to object to the

7    initial information here in that I don't believe it's relevant

8    to the purpose of the hearing.

9         As a narrative, the witness can testify to and has

10   testified, what lead up to it.  I would not object to the

11   portion of the Waiver of Rights, but I have not seen this

12   discovery, and there's additional information that I need, and

13   I need to meet with my client.  And, in fact, I don't even

14   think we can do it today.  If I could do it quickly, I would do

15   that.  But it's not the same statement that I was given in

16   discovery.

17        MR. PETROVIC:  Your Honor, it has the same

18   information.

19        THE COURT:  Counsel, has it been turned over to him?

20        MR. PETROVIC:  The 302, I do not know if that has

21   been turned over to him, they're identical statements.

22        THE COURT:  Up until now, all that has been

23   identified.  This exhibit has been -- the 302, the waiver.

24        MR. SCHLESINGER:  I don't know what --

25        THE COURT:  Well, he needs it by number.

Riedlinger-Direct-Petrovic

1            THE WITNESS:  It's an FD395, your Honor.

2            THE COURT:  FD395.  I knew that.  I was just trying

3    to make sure all of the rest of you did.  That's already been

4    identified, Counsel.

5            MR. PETROVIC:  That's correct.  I can split them up

6    into two exhibits.

7            THE COURT:  Well, let's split them up, and let's make

8    the FD395, Government's Exhibit 1.  That's admitted, there's no

9    objection, correct?

10            MR. SCHLESINGER:  Correct.

11            THE COURT:  And you can handle Exhibit 2 the way you

12    want, Counsel.

13            MR. PETROVIC:  Just for the record, Government's

14    Exhibit Number 1, the FD395, has been admitted?

15            THE COURT:  That's correct.

16            MR. PETROVIC:  Thank you.

17            THE COURT:  For this hearing only.

18            MR. PETROVIC:  Correct.

19    BY MR. PETROVIC:

20    Q.   Sir, can you describe what an FD395 is?

21    A.   It's a written form given by the FBI, an Advice of Rights

22    form.  It lists your advice of rights, the place, date, time

23    and at the bottom it has a little -- an additional statement,

24    which says Waiver of Rights, a place for a signature, the

25    person you're reading the rights to.  And then two slots for

38

Riedlinger-Direct-Petrovic

1   witnesses and the time at the bottom.

2   Q.   And are those rights read to the -- were those rights read

3   to the defendant when you entered the room on the day in

4   question, on May 5th, that evening at approximately 8:00 p.m.?

5   A.   The rights of the defendant at 8:19 p.m.

6   Q.   Was anyone else present?

7   A.   Yes, Corporal Terry Lee.

8   Q.   And did the defendant sign that Waiver of Rights?

9   A.   Yes, he did.

10  Q.   And can you read what is contained in that Waiver of

11  Rights?

12        MR. SCHLESINGER:  I'll waive that.  I think it is an

13  accurate -- I would stipulate that it's an accurate statement

14  of waiver rights.

15        THE COURT:  Overruled.  You may read it.

16        THE WITNESS:  "The Advice of Rights:  Place, Gary,

17  Indiana.  Date, 5-5-1999, time 8:19 p.m.

18        "Your rights:  Before we ask you any questions,

19        you must understand your rights.  You have the right

20        to remain silent.  Anything you say can be used

21        against you in Court.  You have a right to talk to a

22        lawyer for advice before we ask you any questions.

23        You have a right to have a lawyer with you during

24        questioning.  If you cannot afford a lawyer, one will

25        be appointed for you before any questioning, if you

Riedlinger-Direct-Petrovic

1        wish.  If you decide to answer questions now without a
2        lawyer present, you have the right to stop answering
3        at any time.
4            "Waiver of Rights:  I have read the statement of
5        my rights, and I understand what my rights are.  At
6        this time I am willing to answer questions without a
7        lawyer present.  Signed, Roger A. Taylor.  Witness,
8        Anthony T. Riedlinger.  Witness, Corporal Terry Lee.
9        Time 8:20."
10   BY MR. PETROVIC:
11   Q.   And the defendant signed that document in front of you?
12   A.   Yes.  This is a copy of the original, yes.
13   Q.   And that was at 8:19 p.m.?
14   A.   The witnesses signed at 8:20 p.m.
15   Q.   And that's approximately two hours and 20 minutes after
16   the execution of the search warrant?
17   A.   That's correct.
18   Q.   And prior to the defendant signing that document, did you
19   make any promises or deceive the defendant in any way or any
20   fashion urge the defendant to sign that document?
21           MR. SCHLESINGER:  Objection, leading.
22           THE COURT:  Sustained.
23   BY MR. PETROVIC:
24   Q.   Sir, did you offer anything to this defendant to sign that
25   document?

40

Riedlinger-Direct-Petrovic

1  A.   No.

2  Q.   How long after you initially entered the room, had the

3  defendant signed that document?

4  A.   Probably five minutes.

5  Q.   At that point in time, what happened?

6  A.   After the defendant signed?

7  Q.   Correct.

8  A.   We began speaking with the defendant.  I believe the

9  interview at one time was stopped.  Myself and Corporal Lee

10  left the room.  We came back a short time later and started to

11  speak with the defendant again, Mr. Taylor.  Spoke with him a

12  while longer before Corporal Lee left the room.  I finished

13  speaking to Mr. Taylor, and I asked Mr. Taylor if I wrote down

14  an intermittent statement, what he told me tonight, would he

15  be willing to sign that.  At the time, Mr. Taylor said yes.

16       So I exited the room, went to the squad room with my

17  notes, wrote out a handwritten statement, entered back into the

18  interview room.  This time Detective Sergeant Jim Reeder was

19  with me.  I handed the statement that I had written out,

20  Mr. Taylor then read the statement that he had written out, and

21  he said that the information that was in it was true, but he

22  was not going to sign any statement without his lawyer present.

23  And at that time, the interview was terminated.

24  Q.   And, approximately, what was the total time that you can

25  remember that you spent with this defendant in the interview

41

Riedlinger-Direct-Petrovic

1    room?

2            MR. SCHLESINGER:  Your Honor, for purposes of

3    clarification, I think the witness has indicated there may have

4    been three separate times.  I object to the question because it

5    doesn't refer to each time or whether it's total time for the

6    brief.

7            MR. PETROVIC:  I indicated total time.

8            THE COURT:  Sustained.  Ask again, Counsel.  Maybe

9    you can incorporate it in.

10   BY MR. PETROVIC:

11   Q.   Sir, first of all, how many times did you meet with the

12   defendant that evening on separate occasions?

13   A.   Three times.

14   Q.   What is the total time that you met with the defendant on

15   all three occasions?

16   A.   Approximately an hour and a half.

17   Q.   And did the defendant give you a statement that evening?

18   A.   He spoke with me, but he refused to sign a written

19   statement.

20   Q.   And what was some of the substance he indicated in his

21   verbal statement to you?

22   A.   He stated that he never received any money for -- never

23   received any money or sold any drugs in the residence.  At one

24   time an individual named Bird had given him a rock of crack

25   cocaine to hand to a customer.  He said that if they sold drugs

42

Riedlinger-Direct-Petrovic

1  from that residence, he wasn't sure who sold drugs from that

2  residence, and that he had saw crack cocaine in the residence

3  the night the search warrant was executed.

4  Q.   Had you questioned the defendant at all about whether or

5  not his judgment was impaired?

6  A.   Yes.  I asked the defendant if he was on anything.  The

7  defendant said he smoked marijuana 20 minutes before the

8  execution of the search warrant.  I asked if it effected his

9  judgment right now.  He said no.

10 Q.   Did he indicate that had used any heroin that day?

11 A.   No, he did not.

12 Q.   Did he indicate whether or not he was having a heroin

13 withdrawal?

14 A.   No, he did not.

15 Q.   Had he asked for anything, that is, in terms of a

16 bathroom, beverage, or food, and you denied it?

17         MR. SCHLESINGER:  Objection, leading.

18         THE COURT:  Overruled.  You may.

19         THE WITNESS:  No, I did not deny the defendant any of

20 those items.

21 BY MR. PETROVIC:

22 Q.   Was the defendant in any way, physically or

23 psychologically, abused in terms of obtaining that statement or

24 signature on the Advice of Rights?

25         MR. SCHLESINGER:  Objection, your Honor, calls for a

43

Riedlinger-Direct-Petrovic

1    conclusion of this witness.

2           THE COURT:  Sustained.

3           MR. PETROVIC:  Your Honor, I think he can answer

4    whether or not the defendant was physically abused.  Either he

5    was or wasn't.

6           MR. SCHLESINGER:  That wasn't the question, your

7    Honor.

8           THE COURT:  Counsel, what concerns me when you talk

9    about abuse, are you talking about as a lay person -- this

10   young man, I don't believe -- maybe I'm wrong, has the

11   background and training to say when somebody is abused or not.

12          MR. PETROVIC:  Let me rephrase the question.

13          THE COURT:  That might help.

14   BY MR. PETROVIC:

15   Q.   Was there any physical contact involving GRIT officers and

16   the defendant?

17          THE COURT:  You can answer that question.

18          THE WITNESS:  Not in the interview room.

19   BY MR. PETROVIC:

20   Q.   Based on your prior experience interviewing arrestees, did

21   the defendant appear in any fashion sedated from alcohol or

22   narcotics of some sort?

23   A.   No.

24   Q.   Do you know whether or not this was the first time that

25   the defendant had any contact with the law?

44

Riedlinger-Direct-Petrovic

1   A.   Yes, I do.   He has had prior arrests.

2   Q.   He has been arrested in 1984, in 1985, in 1990, in 1991,

3   in 1993?

4             MR. SCHLESINGER:  Objection, your Honor, that's

5   leading, and that is also entering evidence that's not -- that

6   that this witness has already testified to.

7             THE COURT:  Ask what he knows, Counsel.  I'll give it

8   whatever weight I deem necessary.

9             MR. PETROVIC:  I'll leave it there.

10            THE COURT:  I understand.  It's my discretion,

11   counsel.  I'll allow him to lead for a bit so, hopefully, we

12   can get through this hearing and go on to the next hearing.

13            THE WITNESS:  Upon reviewing Mr. Taylor's NCIC print

14   out and arrest reports from the Gary PD, yes.

15   BY MR. PETROVIC:

16   Q.   Had you ever indicated to the defendant what he was

17   charged with or a potential penalty?

18   A.   Yes, I did tell the defendant what he could be charged

19   with and what the possible penalties would be.

20   Q.   And what did you tell the defendant, to the best of your

21   recollection?

22   A.   I said that right now, if I presented the information to

23   the U.S. Attorney's Office, he could be charged with possession

24   with intent to deliver crack cocaine.  And the amount found at

25   the house was seven grams, and according to the Sentencing

45

Riedlinger-Cross-Schlesinger

1   Guidelines, that would be five years mandatory sentence, if
2   convicted.
3   Q.   You indicated to the defendant that it was approximately
4   seven grams?
5   A.   Yes.
6   Q.   Can you describe the interview room in terms of size?
7   A.   It's about -- the approximate size, I'd say 8 by 10.
8   Q.   And what is inside that room?
9   A.   There's a desk with a computer on it, and at the time, I
10   believe, there were three chairs.
11          MR. PETROVIC:  Pass the witness.
12          THE COURT:  Cross?
13                      CROSS-EXAMINATION
14   BY MR. SCHLESINGER:
15   Q.   May I address you as Agent Riedlinger?
16   A.   Yeah, that's fine.
17   Q.   Is agent the proper title?
18   A.   That's fine, yes.
19   Q.   If we're getting into the defendant's prior arrest, you
20   said that you checked his NCIC?
21   A.   Yes.
22   Q.   The report, and you don't -- do you have that with you
23   today?
24   A.   I have a copy of it.  There's a copy of it in the hallway.
25   Q.   But you don't have it on the witness stand?

Riedlinger-Cross-Schlesinger

1   A.   No, I do not.

2   Q.   And you don't know, from your personal knowledge, whether

3   he was ever read his rights on any of those occasions?

4   A.   No, I don't know that.

5   Q.   You said you assisted in the serving of the search

6   warrant?

7   A.   Yes, I did.

8   Q.   Was it 447 Fillmore Street?

9   A.   Yes, it was.

10   Q.   Did -- was there any record of made at the time the

11   warrant -- at the execution of warrant?

12   A.   Yes, there was.

13   Q.   And where would that be?

14   A.   It's on an FD302.

15   Q.   And what's an FD302?

16   A.   That's -- it's a basic report form for the Bureau.

17   Q.   And did you review that before you came in today?

18   A.   Yes, I did.

19   Q.   What time did the FD302 indicate the search commenced?

20   A.   I can only give approximately at 6:00 p.m.

21   Q.   Within 15 minutes either way?

22   A.   Yes.

23   Q.   To your recollection?

24   A.   Yes.

25   Q.   You said there was 10 individuals from the GRIT Task Force

47

Riedlinger-Cross-Schlesinger

1  who served --

2  A.   I said approximately 10 individuals, yes.  I can't be for

3  sure.

4  Q.   Is there a record of how many people were on the team that

5  searched the residence?

6  A.   Yes.  Searched the residence?

7  Q.   Served the warrant?

8  A.   Served the warrant, yes, there is.

9  Q.   Would that also be the FD302?

10  A.   Yes, there's also an Operations Order listing the

11  participants.

12  Q.   And that would also identify the agents?

13  A.   Yes.

14  Q.   And you were on the observation post, is that correct?

15  A.   No.

16  Q.   Where were you?

17  A.   Basically I was an evidence control person, and I was on a

18  vehicle we take that helps the facilitation of collection of

19  evidence.

20  Q.   Where, in relation to the residence at 447 Fillmore, was

21  the vehicle that you were in?

22  A.   During which time?

23  Q.   I'm speaking of when it commenced?

24  A.   When the SWAT team gained entry, we were probably half a

25  block to a block away.

48

Riedlinger-Cross-Schlesinger

1  Q.   That was so that the people in the residence would not be
2  aware that the SWAT team was coming, I would assume?
3  A.   That's correct.
4  Q.   Now, when you say SWAT team, they were wearing
5  bullet-proof vests or body armour, I guess it's called?
6  A.   I would assume so.
7  Q.   But you did observe the officers at some point in time?
8  A.   Yes, I did.
9  Q.   Okay.  Do they wear a standard GRIT uniform, or is there
10 another uniform they wear?
11 A.   They wear a Gary PD SWAT uniform.
12 Q.   Do they wear helmets?
13 A.   Yes.
14 Q.   And does everyone on the team who executes -- enters the
15 residence, carry a weapon?
16 A.   Yes.
17 Q.   Do they carry shotguns and automatic weapons as well as
18 hand weapons?
19 A.   We're speaking of the SWAT team?
20 Q.   Yes.
21 A.   I wouldn't know.  I know some of the individuals do.
22 Q.   After those -- after your team commenced execution of the
23 warrant, did you move -- or did someone move the vehicle in
24 which you were?
25 A.   Yes.

49

Riedlinger-Cross-Schlesinger

1    Q.   Were was it moved to?

2    A.   To directly in front of the residence.

3    Q.   Did you see the defendant at any time between the --

4    between the time the warrant commenced and the time you moved

5    in front of the residence?

6            MR. PETROVIC:  Your Honor, I'm going to object,

7    beyond the scope.

8            THE COURT:  Overruled.  I'll give it whatever weight

9    I deem necessary.

10           THE WITNESS:  Could you repeat the question, please?

11   BY MR. SCHLESINGER:

12   Q.   Did you see the defendant at any time between the time the

13   time the execution of the warrant commenced and the time you

14   moved your vehicle?

15   A.   In front of the residence, no.  I saw some individuals

16   standing in front of the house, but I was not able to identify

17   them.

18   Q.   Do you recall when the first time you saw the defendant

19   was?

20   A.   Sometime after the vehicle was moved to the front of the

21   residence.

22   Q.   Was he placed in a vehicle for transport to GRIT

23   headquarters?

24   A.   Originally, he was placed in the front yard, and I believe

25   he was searched there and photographed there.

50

Riedlinger-Cross-Schlesinger

1   Q.   Do you know if he was searched in the back prior to
2   bringing him into the front yard?
3   A.   No, I do not know.
4   Q.   Did you see him lying prone on the ground in the front
5   yard?
6   A.   Yes, he was.
7   Q.   And there were other individuals with him at that time?
8   A.   Yes, there was.
9   Q.   And do you know how long he laid prone in the front yard?
10  A.   I do not know.
11  Q.   Is there any record what time he was transported to GRIT
12  headquarters?
13  A.   No, there's not.
14  Q.   Do you know who transported him?
15  A.   I believe Corporal Lee and Detective Douglas.
16  Q.   And do you know how many people were arrested upon
17  execution of the warrant?
18  A.   I believe five.
19  Q.   And are the -- is it standard policy to keep the -- any
20  arrestees separate?
21  A.   They're transported back, and, yes, they're separated once
22  they're at the GRIT office.
23  Q.   And one of those people was eventually released, is that
24  correct?
25  A.   Yes, I believe so.

51

Riedlinger-Cross-Schlesinger

1   Q.   Do you know how long Mr. Taylor was at GRIT headquarters
2   before the first time you contacted him?
3   A.   Approximately, once again, an hour and 40 minutes.
4   Q.   Was there a typewriter in the room with him?
5   A.   I think it was a computer.  I'm not sure if there's a
6   typewriter there or not.
7   Q.   Was there any reason you had to leave the room to type his
8   statement?
9   A.   I did it in handwriting.  There's also no printer attached
10  to the computer in the room.
11  Q.   You hand wrote his statement?
12  A.   I hand wrote his statement, yes.
13  Q.   But you did not do that in his presence?
14  A.   No, I did not.
15  Q.   So, was your testimony you returned to GRIT headquarters
16  at approximately at 6:30 p.m.?
17  A.   No.
18  Q.   Okay.  What time did you return or that Mr. Taylor went to
19  GRIT headquarters, if you know?
20  A.   I'm not for sure of the time Mr. Taylor got to GRIT
21  headquarters.  I believe it was around 6:30 p.m.  I did not
22  arrive there until approximately sometime before 8:00 p.m.
23  Q.   Were you in charge of taking a statement from Mr. Taylor?
24  A.   When I returned back, I'd ask if everyone had been spoken
25  to, and they said no.  And, actually, I spoke to Mr. Drayton

52

Riedlinger-Cross-Schlesinger

1    first.

2    Q.   Did one officer supervise this operation?

3    A.   There's a case agent assigned and there was a supervisor

4    there, also.

5    Q.   Who were they?

6    A.   I believe since I was the FBI person assigned to this

7    team, I was the FBI case agent.  And then the supervisor was

8    Mark Becker.

9    Q.   And is it part of your job to attempt to elicit evidence

10   from the defendants after the -- or from the people arrested

11   after they have been taken into custody, isn't it?

12   A.   We interview a subject, yes.

13   Q.   And you interview them for the purpose of obtaining

14   evidence that you can use either to convict them or to convict

15   other people who are arrested?

16   A.   For exculpatory purposes, yes.

17   Q.   And you did advise -- you stated you did advise Mr. Taylor

18   of what he was charged with, or what you believed he could be

19   charged with?

20   A.   Yes.

21   Q.   And that was possession of cocaine with intent to

22   distribute?

23   A.   Yes.

24   Q.   And there was no cocaine found on him at the time of his

25   arrest, however?

53

Riedlinger-Cross-Schlesinger

1  A.    That's correct.

2  Q.    And you indicated that he could be facing a five-year

3  sentence?

4  A.    Yes.

5  Q.    Did you or anyone in your presence tell him that he could

6  be held at the -- or he could go to the MCC for a period of

7  five years if he didn't cooperate?

8  A.    At MCC?  No, I said he could be detained at the MCC, but

9  the other part, no.

10  Q.    He could be detained if he did not cooperate, is that what

11  you told him?

12  A.    If he was charged, he could be detained at the MCC.  If he

13  wished to cooperate, then he could speak with us now, and then

14  he could tell us what was going on and I would make his

15  cooperation known to the Assistant United States Attorney.  I

16  don't make promises of what could or could not happen.

17  Q.    Did you or anyone else in your presence, tell him that he

18  could leave, if he gave a statement?

19  A.    No.

20  Q.    Was he given anything to drink during the period of his

21  detention?

22  A.    I didn't give him anything to drink, no.

23  Q.    And you did not offer him anything to drink?

24  A.    Yes, I did.

25  Q.    You did.  Okay.  What did you offer him?

54

Riedlinger-Cross-Schlesinger

1  A.    When we go into the interview room, we always ask the

2  person if they need anything to drink?

3  Q.    Okay.  The first time he entered?

4  A.    Yes.

5  Q.    And you also read him his rights the first time he

6  entered?

7  A.    Yes.

8  Q.    Do you read the rights directly from the sheet?

9  A.    Yes, I do.

10  Q.    And it's -- well, we'll get a copy of the sheet, so this

11  would have been the sheet from which you read his

12  constitutional rights?

13  A.    That's correct.

14  Q.    And he did not indicate that he wanted an attorney

15  present?

16  A.    No, he did not.

17  Q.    He eventually did indicate that, but it was not until you

18  had handwritten his statement?

19  A.    That's correct.

20  Q.    And -- let me make sure I'm clear on this.  How long after

21  you advised him of his rights did he eventually give you a

22  statement?

23  A.    He never actually gave -- are you speaking -- could you

24  clarify that?

25  Q.    Okay.  How long after you advised him of rights did you

55

Riedlinger-Cross-Schlesinger

1    make notes regarding what he had told you?

2    A.    I began taking notes as soon as I began talking with him.

3    Q.    When did you finish taking notes?

4    A.    Approximation, I'd have to say no more than two hours

5    later.

6    Q.    So, did you question him for a two-hour period

7    consistently?

8    A.    No.

9    Q.    Did you ever leave the room?

10   A.    Yes.

11   Q.    I'm going to show you a copy of the document -- show you a

12   copy of a -- and see if you can identify that.

13         THE COURT:  What is the exhibit, Counsel?

14         MR. SCHLESINGER:  Defendant's Exhibit A.

15         Just the front sheet, I think the back might be the

16   Advice of Rights.

17         THE WITNESS:  Yeah, it is.  The front sheet, yes,

18   that's my handwritten statement that I was going to give to

19   Mr. Taylor.

20   BY MR. SCHLESINGER:

21   Q.    That's the one you left the room to prepare by hand?

22   A.    Yes.

23   Q.    After questioning for approximately two hours?

24   A.    No.  I was in and out of the room.  Over the period --

25   from the time period when I began questioning to the time that

56

Riedlinger-Cross-Schlesinger

1   I quit taking notes was approximately two hours.

2   Q.   And then you -- you --

3   A.   I was in and out of the room, as I said before.

4   Q.   And you took that statement and went to another room to

5   type it up?

6   A.   No, I took the statement -- or I took my notes and went to

7   another room to write it out.

8   Q.   So those are your notes then?

9   A.   No, that's my writing for the handwritten statement.

10  Q.   I'm lost as to what the handwritten statement is versus

11  what your notes are?

12  A.   My notes are my notes that I took during the course of the

13  interview.  From my notes I prepared this statement.

14  Q.   Did you do that in the defendant's presence?

15  A.   No, I did not.

16  Q.   And then -- now, that's a printed handwritten statement?

17  A.   Yes, it is.

18  Q.   So, you then typed that up?

19  A.   No, I did not.

20  Q.   Did anyone type it?

21  A.   Later on there was a -- attached to my FD302, a steno

22  typed it.

23  Q.   So, did you present the defendant with anything to sign

24  that evening -- other than the Miranda Rights form?

25  A.   The handwritten form right there that you presented me.

57

Riedlinger-Cross-Schlesinger

1  Q.   That's what you presented to him?

2  A.   Yes.

3  Q.   And there's no time on that form?

4  A.   No, there's not.

5  Q.   It's your testimony the defendant never asked for medical

6  attention at all?

7  A.   At the time of the interview, no.

8  Q.   Not between the time -- well, when you first came in

9  contact with him, it would have been approximately 8:15, I

10  would assume?

11  A.   That's correct.

12  Q.   And at what time did you present him with the handwritten

13  statement to sign?

14  A.   At approximately, 10:15 to 10:30.

15  Q.   And during that period of time, and I understand you were

16  in and out of the room, he never requested medical attention?

17  A.   No.

18  Q.   He never indicated that he was going through heroin

19  withdrawal?

20  A.   No, he did not.

21  Q.   Do you believe the defendant was telling you the truth in

22  what he told you?

23        MR. PETROVIC:   Objection, your Honor, speculation.

24  BY MR. SCHLESINGER:

25  Q.   Based on your observations?

58

1   THE COURT:  Overruled.  I'll give it whatever weight

2 I deem necessary.

3   THE WITNESS:  Could you repeat the question, please?

4 BY MR. SCHLESINGER:

5 Q.  Did you believe that the defendant was giving you truthful

6 information, based on your observations of him?

7 A.  Some of what he was telling me was truthful, yes.

8   MR. SCHLESINGER:  I have no further questions.

9   THE COURT:  Redirect?

10   MR. PETROVIC:  Nothing else, your Honor.

11   THE COURT:  You may step down.

12  (Witness excused.)

13   Counsel, can I see all three of you up here?

14  (Side bar conference.)

15   Counsel, I know that it's important to each of you to

16 go through his materials in some detail.  And rather than say

17 something, sometimes you repeat things.  At the same time I

18 have Mr. Bauer, who was supposed to be here at 1:00 o'clock or

19 2:00 o'clock, and he's still here.

20   MR. PETROVIC:  I have no problem, if you want to

21 continue this matter.

22   THE COURT:  Well, I don't want to continue it.  I'm

23 just concerned about moving along.  The reason I don't want to

24 continue it, I'll be frank with you, my law clerk will be

25 leaving this week, so I want to get it done, you know, before

59

 1 | that.

 2 | MR. PETROVIC:  That's why I'm not going to do any

 3 | redirect, because I'm trying to move it on.

 4 | THE COURT:  How much longer do you think your next

 5 | witness is?

 6 | MR. PETROVIC:  The next two are -- have to be a third

 7 | of what he was, each.

 8 | THE COURT:  Mr. Bauer, how long is your hearing going

 9 | to be?  Guesstimate?

10 | MR. BAUER:  Not that long, Judge, really.  I've

11 | probably got 20 minutes of testimony.

12 | THE COURT:  Since you only have two or three

13 | objections, then --

14 | MR. BAUER:  I wasn't going to address those.  But all

15 | my evidence was attached to my objections, in the nature of

16 | 302s and documents.

17 | THE COURT:  Can this be done in a half hour, do you

18 | think?

19 | MR. BAUER:  No, Judge.

20 | THE COURT:  Okay.  I'm not pushing, I'm just trying

21 | to find out.

22 | MR. BAUER:  Right.  I think we're looking at, you

23 | know, within an hour.

24 | THE COURT:  If I could stick you in on Wednesday,

25 | could you come back on Wednesday because I want to give you the

60

1   time that you need for your hearing, because that's unfair.

2              MR. BAUER:  What time, your Honor?

3              THE COURT:  Well, let's take a look.  I have a

4   sentencing at 2:00 o'clock.  I haven't looked at it closely,

5   but I'd say about 3:00, 3:30?

6              MR. BAUER:  I know my schedule is full, Judge,

7   because I just put something in.

8              THE COURT:  Could you do me a favor, Mr. Bauer, would

9   you find out if Mr. Benson is upstairs, and if that's okay with

10  him?

11             MR. BAUER:  Yeah, I know he's upstairs.

12             MR. PETROVIC:  He's upstairs, I know he is.

13             THE COURT:  Miss Rivera, we should be able to do

14  Solano in an hour, hour and a half, an hour?

15             MS. RIVERA:  We have an interpreter, so I'd have to

16  say an hour and a half, maybe.

17             THE COURT:  Why don't we make it at 3:30 and if worse

18  comes to worse, 4:00 o'clock.  But if there's an interpreter, I

19  agree.

20             MS. RIVERA:  Can I interrupt you a minute, Judge?

21  This attorney has filed an offer to continue that change of

22  plea.  So we may have a 12:30 open.  He had two previous set

23  commitments.

24             THE COURT:  Are they going to be able to get it in

25  before the sentencing?

61

1          MS. RIVERA:  There is no trial date, so if he waives
2     speedy trial --
3          THE COURT:  How about 12:30?
4          MR. BAUER:  That would work fine, Judge.
5          THE COURT:  See if Mr. Benson will do that.
6          MR. BAUER:  All right.  I'll check with him.
7          THE COURT:  Check both times, Mr. Bauer, we'll get
8     one or the other one, okay.
9          (End of side bar.)
10          Call your next witness.
11          Sir, please come to the witness stand right here and
12     when you arrive, turn and face me and I'll swear you in.
13          Mr. Petrovic, would you pick up the exhibit?
14          MR. PETROVIC:  Yes.  Your Honor, I'd also request
15     Mr. Riedlinger -- is he free to leave?
16          THE COURT:  He's released.
17          Please raise your right hand.
18          (Witness sworn in.)
19          THE WITNESS:  I do.
20          THE COURT:  Please be seated, pull your chair up,
21     speak directly into the microphone loud enough so that
22     everybody in the courtroom may hear.
23          Mr. Petrovic, you may proceed.
24          MR. PETROVIC:  Thank you.
25                         TERRY LEE,

62

T. Lee-Direct-Petrovic

1   called as a witness by the Government herein, having been first
2   duly sworn, was examined and testified as follows:
3                     DIRECT EXAMINATION
4   BY MR. PETROVIC:
5   Q.    Sir, can you please state and spell your name for the
6   record.
7   A.    Yes, my name is Terry Lee.   Terry, T-E-R-R-Y, Lee, L-E-E.
8   Q.    And by whom are you employed?
9   A.    I'm employed with the City of Gary, Gary Police
10  Department.
11  Q.    How long have you been employed with that agency?
12  A.    Approximately 15 years.
13  Q.    And have you recently been assigned to any task force?
14  A.    Yes, I'm assigned to the GRIT Task Force.
15  Q.    And you've been involved with that task force how long?
16  A.    Approximately, two years.
17  Q.    And what are some of your duties within that task force?
18  A.    Investigate homicides, violent federal crimes and drug
19  trafficking.
20  Q.    And as part of your duties, were you involved with a
21  search warrant May 5th, 1999, at 447 Fillmore Street, in Gary,
22  Indiana?
23  A.    Yes, I was.
24  Q.    And what was your involvement in that case?
25  A.    Prior to the search warrant, myself and another officer,

63

T. Lee-Direct-Petrovic

1  along with another team of officers went to the location to do

2  a drive by.  Myself and the officers that was with me, was

3  operating some video surveillance equipment.

4  Q.    And you were video taping at what location?

5  A.    Where?  447 Fillmore.

6  Q.    And were you involved in the actual search warrant?

7  A.    Yes.

8  Q.    What kind of involvement did you have?  Were you on the

9  perimeter, actual SWAT, the actual team that was in the

10 residence, what involvement did you have?

11 A.    Myself and the officer that I was with, we were perimeter

12 security.

13 Q.    After the search warrant, were you involved -- how were

14 you involved after the actual execution?

15 A.    After the actual execution of the warrant an "all clear"

16 was given by the SWAT team, and we were called to the front of

17 the residence to help transport prisoners.

18 Q.    And whom did you transport, if you recall?

19 A.    I don't recall his name, but it was a gentleman that had

20 some drugs laying by his leg.

21 Q.    And was it the defendant in this case in this courtroom

22 right today, a Roger Taylor?  Was this the individual?

23 A.    No.

24 Q.    And after, you transported that one individual back to

25 where?

64

T. Lee-Direct-Petrovic

1   A.   To the GRIT office.

2   Q.   What did you do then?

3   A.   We secured him into one of our interview rooms.

4   Q.   And were you ever involved in any of the interviews that

5   evening?

6   A.   Yes.

7   Q.   Were you involved with the interview of a Roger Taylor?

8   A.   Yes, I was.

9   Q.   And what was your involvement in that interview?

10  A.   I was asked by Tony Riedlinger to go in while he asked the

11  subject -- the gentleman of his rights.   And then he did the

12  interview.

13          MR. PETROVIC:   May I approach, your Honor?

14          THE COURT:   You may.

15  BY MR. PETROVIC:

16  Q.   I'm showing you what's been previously marked as

17  Government's Exhibit 1.   Can you identify that object?

18  A.   Yes, I can.

19  Q.   And what is that object?

20  A.   It's an Advice of Rights form.

21  Q.   And for whom?

22  A.   It's for Roger A. Taylor.

23  Q.   And how were you involved with that document?

24  A.   I witnessed him reading the questions to himself and

25  signing it.

65

T. Lee-Direct-Petrovic

1 | Q.   You witnessed who reading those questions to himself?

2 | A.   He was reading them to himself, Anthony Riedlinger was

3 | reading from another sheet to him.

4 | Q.   And "he" is the defendant, Roger Taylor?

5 | A.   Yes.

6 | Q.   And did you witness the defendant sign that document?

7 | A.   Yes, I did.

8 | Q.   Is that after Agent Riedlinger read out the defendant's

9 | constitutional rights to him?

10 | A.   Yes, it is.

11 | Q.   At any time -- how long were you in the interview room?

12 | A.   The exact time, I don't know, but I was in there in the

13 | beginning with Tony Riedlinger.

14 | Q.   Did you stay the whole time?

15 | A.   No, actually, I left out.

16 | Q.   Approximately how long after the Advice of Rights?

17 | A.   I couldn't tell you the approximate time, but I did an

18 | arrest report while I was sitting in there.

19 | Q.   So you went in on the initial interview, correct?

20 | A.   Yes.

21 | Q.   Did you come back at any time later?

22 | A.   I don't recall, sir.

23 | Q.   Were you involved with any of the other interviews?

24 | A.   Yes.

25 | Q.   So, you were in other rooms as well?

66

T. Lee-Direct-Petrovic

1   A.    Yes.

2   Q.    And do you recall whether or not any of the officers,

3   yourself included, used physical contact on this defendant?

4   A.    No.

5   Q.    Do you recall whether or not the defendant asked for any

6   assistance at any time?

7   A.    No, he didn't.

8   Q.    Do you recall whether or not the defendant asked for any

9   medical attention?

10  A.    No, he did not.

11  Q.    Do you recall whether or not Agent Riedlinger advised the

12  defendant of possible charges and penalties?

13  A.    Yes.

14  Q.    Do you recall what he indicated that day, to the best of

15  your recollection?

16  A.    He advised him that these were federal charges that

17  everyone was facing.  And that was about it, he asked his

18  charges.

19  Q.    To the best of your recollection?

20  A.    To the best of my knowledge, yes.

21  Q.    Do you recall anything -- strike that.

22        Based on your experience as a law enforcement

23  officer, did the defendant, Roger Taylor, appear impaired to

24  you in any fashion?

25  A.    No, he didn't.

T. Lee-Direct-Petrovic

1  Q.   Did the defendant, Roger Taylor, say anything or do

2  anything which would indicate that he might have been impaired

3  that evening?

4  A.   No, he did not.

5         MR. PETROVIC:  Pass the witness, your Honor.

6         THE COURT:  Cross?

7                      CROSS-EXAMINATION

8  BY MR. SCHLESINGER:

9  Q.   Officer Lee, do you recall what time on May 5th the GRIT

10  Task Force began executing the search warrant?

11  A.   It was around 6:00 o'clock in the p.m.

12  Q.   And you were not part of the group that initially executed

13  the warrant?

14  A.   No, I wasn't part of the group that went into the home,

15  no.

16  Q.   Do you know how many agents went into the home originally?

17  A.   No.

18  Q.   Was it more than 10?

19  A.   I could not tell you.

20  Q.   And these agents are all armed, is that correct?

21  A.   That is correct.

22  Q.   Did -- there were other agents like yourself who came up

23  after the residence had been secured, is that what your purpose

24  was?

25  A.   We provide security for the SWAT team after they go into

T. Lee-Direct-Petrovic

1    the home or residence.  Once it's secured, being secured by the
2    SWAT team, they will come out and we will go in to begin the
3    search.
4    Q.   Do you know how many additional officers participated in
5    the search other than the SWAT team?
6    A.   No.
7    Q.   Did -- when was the first time you saw Roger Taylor on
8    that day, if you recall?
9    A.   It had to be at the GRIT office.
10   Q.   You don't recall seeing him at the residence at all?
11   A.   No.
12   Q.   Do you recall seeing people who were about to be arrested?
13   A.   Yes.
14   Q.   And where did you see those people?
15   A.   I saw two in the front of the house.
16   Q.   What position were they in in the front of the house?
17   A.   The ones transported was standing up, because they brought
18   them to me to take them to the GRIT office.
19   Q.   So they already had been searched at that time?
20   A.   Yes, they was given to me for transporting, so they have
21   been searched.
22   Q.   Do you know where they were searched?
23   A.   No, I don't.
24   Q.   Then you don't know if Mr. Taylor was the other person
25   that you saw?

69

                    T. Lee-Direct-Petrovic

1   A.   No, the other person was a female.

2   Q.   At any time did you see people lying prone in front of the

3   residence?

4   A.   No.  Yes, I did.  I saw one gentleman laying prone.

5   Q.   Was that the person you transported?

6   A.   That's the person I transported.  He was laying prone,

7   then they stood him up and brought him to me.

8   Q.   And so you took the person that you transported to the

9   GRIT headquarters and you -- they were cuffed at that time?

10  A.   Yes.

11  Q.   And they were put into an interview room?

12  A.   That's correct.

13  Q.   And, eventually, you participated in the interview with

14  Mr. Taylor?

15  A.   Yes.

16  Q.   And do you remember what time that interview commenced?

17  A.   It started prior to the Advice of Rights form when we

18  walked in.

19  Q.   Did you and Officer Riedlinger enter the room together?

20  A.   Yes.

21  Q.   And did you speak with Agent Riedlinger after he

22  testified?

23  A.   No, I didn't.

24          THE COURT:  Are you asking today, Counsel?

25          MR. SCHLESINGER:  Yeah.

T. Lee-Direct-Petrovic

1   BY MR. SCHLESINGER:

2   Q.    Did that -- on that evening then, the first thing that

3   Officer Riedlinger did was to read the subject his Miranda

4   rights?

5   A.    No.

6   Q.    What was the first thing he did?

7   A.    When we walked in, he told them who we were.  And Tony --

8   Officer Riedlinger asked him did he need to use the washroom or

9   anything.

10  Q.    Agent Riedlinger asked that of the defendant?

11  A.    Yes.

12  Q.    And what did the defendant say?

13  A.    No.

14  Q.    Do you recall if he offered him any food or beverage?

15  A.    He offered him pop, water or popcorn, that's all we had.

16  Q.    And the defendant did not want water or popcorn?

17  A.    No.

18  Q.    Did he then proceed to read him his Miranda Rights?

19  A.    He was talking to him in regards to cooperating, and then

20  he read him -- asked him -- he told him he was going to read

21  him his rights.

22  Q.    You take it he did advise him of -- that he was going to

23  face federal charges?

24  A.    Yes.

25  Q.    Did he do that before or after Miranda, if you remember?

T. Lee-Direct-Petrovic

1    A.   I don't remember.

2    Q.   Do you recall him telling Mr. Taylor that he was looking

3    at a five-year minimum?

4    A.   I don't remember.

5    Q.   Do you recall his telling Mr. Taylor that he would be

6    charged with possession of cocaine with intent to distribute?

7    A.   I heard him saying for federal charges, I don't remember

8    the exact --

9    Q.   I'm sorry.

10   A.   I don't recall the exact number of time he was going to

11   do.

12   Q.   And you don't recall him saying anything specific about

13   the charges, there being federal charges?

14   A.   (No answer.)

15   Q.   How long were you with Mr. Taylor that first time?

16   A.   I would say for -- to do the Advice of Rights form, and I

17   was filling out a Gary Police Department arrest report.

18   Q.   Did you sign that arrest report?

19   A.   Yes, my signature is on there.  Or my name, rather.

20   Q.   Would anybody else sign that, or just you?

21   A.   Well, I was actually doing the arrest report, so it

22   probably just has my name on it.  It's the booking officer.

23   Q.   Did you leave Agent Riedlinger alone with the defendant at

24   that time?

25   A.   I did get up and leave, yes.

72

T. Lee-Direct-Petrovic

1  Q.  So Agent Riedlinger would have been alone with him in the
2  room?

3  A.  Yes.

4  Q.  Did the defendant discuss any of the -- did he make any
5  statements in your presence?

6  A.  He -- they were talking and I was listening to some of it.
7  He made a statement that he didn't sell drugs there, but he
8  sold something one time prior to us coming there.  He said it
9  was a while ago.

10  Q.  And that was in your statement -- in your presence,
11  rather?

12  A.  Yes, that was said while I was there.

13  Q.  Did you take any notes while he was interviewing?

14  A.  No, I was filling out my arrest report.

15  Q.  Did you have a tape recorder going?

16  A.  No.

17  Q.  Did you go in to talk to Mr. Taylor at any time later that
18  evening?

19  A.  I don't recall talking to him at any other time.  In fact,
20  I don't recall talking to him at any time, other than when I
21  went in with Tony.

22  Q.  Were you present while he was being interviewed -- let me
23  ask it that way -- other than you filled out the Gary Police
24  report, you left the room, correct?

25  A.  That's correct.

73

T. Lee-Direct-Petrovic

1  Q.   Did -- were you present any time later that evening during
2  any interviews of Mr. Taylor?
3  A.   I don't recall.
4  Q.   Do you recall Mr. Taylor saying he was a heroin addict?
5  A.   No.
6  Q.   And you don't recall him asking for any medical attention?
7  A.   No.
8  Q.   Do you know if he ever got any medical attention?
9  A.   Oh, yes, he did.
10 Q.   And when was that?
11 A.   The following day.
12 Q.   Did you know how that came about?
13 A.   When he was transported over here to the Marshal's
14 Services, he was put in their holding facility.  One of the
15 Marshals came out and told an officer that I was with that we
16 had to take the defendant to the hospital.
17 Q.   So you took him to the hospital?
18 A.   I took one of them, I don't which one.
19 Q.   Did you take him to St. Margaret's Hospital?
20 A.   The one that's --
21 Q.   Did you take him to the hospital?
22 A.   Yes, I did.
23       MR. SCHLESINGER:  You'll probably take judicial
24 notice of the that fact that St. Margaret is --
25       THE COURT:  I will do that, Counsel.

74

```
 1   BY MR. SCHLESINGER:
 2   Q.   And then you transported to the courthouse?
 3   A.   Yes.
 4   Q.   You don't know if that was this defendant?
 5   A.   I don't know which one it was.
 6             MR. SCHLESINGER:  I have no further questions.
 7             THE COURT:  Redirect?
 8             MR. PETROVIC:  Nothing else, your Honor.
 9             THE COURT:  Counsel, do you need this witness any
10   further?
11             MR. SCHLESINGER:  No.
12             THE COURT:  You are released.  You are free to go
13   home.
14        (Witness excused.)
15             Counsel, retrieve the exhibit.  Please call your next
16   witness.
17             Mr. Bauer, did you get any information?
18             Sir, please come to the witness stand right here and
19   when you arrive, turn and face me and I'll swear you in.
20   Please raise your right hand.
21        (Witness sworn.)
22             THE DEFENDANT:  I do.
23             THE COURT:  Please be seated, pull your chair up,
24   speak directly into the microphone loud enough so that
25   everybody in this courtroom may hear.
```

75

J. Reeder-Direct-Petrovic

1      Counsel, would you retrieve the exhibits, please.

2      MR. PETROVIC:  Yes.

3      THE COURT:  You may proceed with your examination.

4                  JAMES A. REEDER,

5  called as a witness by the Government herein, having been first

6  duly sworn, was examined and testified as follows:

7                  DIRECT EXAMINATION

8  BY MR. PETROVIC:

9  Q.   Sir, can you please state and spell your name for the

10 record.

11 A.   James A. Reeder, R-E-E-D-E-R.

12 Q.   And with whom are you employed?

13 A.   I'm a Detective Sergeant with the Porter County Sheriff's

14 Police.

15 Q.   And how long have you been employed with that agency?

16 A.   Twenty-one years in November.

17 Q.   And this past year, were you assigned to any special task

18 force?

19 A.   Yes, I was.  On January 18th of this year, I was assigned

20 to the GRIT Task Force in Gary.

21 Q.   And what were some of your duties on that task force?

22 A.   I was assigned as an investigator with the afternoon drug

23 investigation team.

24 Q.   And were you involved in the investigation of a 447

25 Fillmore Street, May 5th, 1999?

J. Reeder-Direct-Petrovic

1   A.    Yes, I was.

2   Q.    And what was your involvement in that case?

3   A.    I was assigned rear perimeter security, and I was also

4   assigned the responsibility of preparing the diagram of the

5   interior of the residence.  And evidence collection.

6   Q.    And were you involved in any fashion of the interviewing

7   of the any of the defendants arrested that evening?

8   A.    Not the direct interview, no.

9   Q.    And were you involved at all with a Roger Taylor that

10  evening?

11  A.    Very briefly.

12  Q.    And explain to the Court your involvement that evening?

13  A.    While I was preparing my paperwork for my portion of my

14  assignments, Agent Riedlinger asked me if I would assist him

15  while he asked Mr. Taylor to sign a statement that he prepared.

16  Q.    And did you, in fact, assist Agent Riedlinger?

17  A.    Yes, I did.

18  Q.    And do you recall approximately what time that would have

19  been?

20  A.    No, I don't.

21  Q.    And can you explain what happened that evening when Agent

22  Riedlinger entered that room?

23  A.    He entered the room and Agent Riedlinger read the

24  statement that he had prepared to the defendant.  He then

25  looked at it and he stated that everything in the statement was

J. Reeder-Direct-Petrovic

1    true, but that he would not sign it until he had a chance to

2    counsel with his attorney.

3    Q.    But that -- so he never signed the paper that evening?

4    A.    No, not in my presence.

5    Q.    And how long were you in that room with defendant Roger

6    Taylor?

7    A.    No more than five minutes.

8    Q.    And was that the extent of your involvement with Roger

9    Taylor?

10   A.    That evening, yes.

11   Q.    And during that time, had the defendant ever indicated

12   that he a heroin addict and he was going through withdrawal?

13   A.    Not in my presence.

14   Q.    And did he ever ask in your presence whether or not he

15   needed medical attention?

16   A.    No, he did not.

17   Q.    Based upon your prior experience as a law enforcement

18   officer, did the defendant here seem impaired in any fashion?

19   A.    No, he did not.

20   Q.    During your presence in the room, did the defendant ever

21   ask for the washroom facilities, food, beverages in your

22   presence?

23   A.    No, he did not.

24             MR. PETROVIC:  Pass the witness.

25             THE COURT:  Cross?

J. Reeder-Cross-Schlesinger

CROSS-EXAMINATION

BY MR. SCHLESINGER:

Q.   Officer Reeder, have you ever dealt with people who were going through withdrawal from heroin?

A.   No, I haven't.

Q.   You indicated you were assigned rear perimeter security upon execution of the search warrant?

A.   Yes, I was.

Q.   And do you know how many agents -- my understanding is the SWAT team actually goes in first to execute the warrant, is that correct?

A.   Yes, sir.

Q.   Do you know how many SWAT agents executed the warrant?

A.   No, I don't.

Q.   Would it have been more than ten?

        MR. PETROVIC:  Objection, your Honor, asked and answered.  He indicated he did not know.

        MR. SCHLESINGER:  He said he didn't know exactly.

        MR. PETROVIC:  He said he did not know.

        THE COURT:  Gentlemen, I'll decide what was said.  I think he did say, I don't know.  However, it is cross-examination, Mr. Schlesinger.  As long as you don't go into to much detail, I'll let you cross-examine.

BY MR. SCHLESINGER:

Q.   Do you know if it was more than ten?

J. Reeder-Cross-Schlesinger

1   A.   On the SWAT team?

2   Q.   Right.

3   A.   I think so, yes.

4   Q.   And then there were additionally agents such as yourself,

5   Agent Riedlinger, Corporal Lee, who were on the perimeter for

6   various reasons?

7   A.   Yes, sir.

8   Q.   And you then entered the premises after it was secured?

9   A.   Yes, sir.

10  Q.   Do you recall seeing the defendant at any time when you

11  entered the premises?

12  A.   I was in the back of the building the entire time, until

13  it was clear for us to enter.

14  Q.   Did you see any vehicles in the back of the building?

15  A.   I can't recall for sure.

16  Q.   Did you specifically see a car that was up on blocks that

17  was being worked on?

18        MR. PETROVIC:   Your Honor, objection.   The witness

19  indicated he did not recall.   And then defense counsel says

20  specifically can you --

21        THE COURT:   Overruled.   Cross-examination.

22  BY MR. SCHLESINGER:

23  Q.   Did you see a vehicle on blocks anywhere?

24  A.   I don't recall.

25        THE COURT:   Let's move on.

J. Reeder-Cross-Schlesinger

1    BY MR. SCHLESINGER:

2    Q.    Did you see any suspects lying prone on the ground?

3    A.    At the back of the residence I don't recall seeing any,

4    no.

5    Q.    Do you know what time the execution of the warrant

6    commenced?

7    A.    I believe it was around 6:20, 6:30 or something like that.

8    Q.    Did -- did you have any part in transporting anybody to

9    the GRIT Task Force?

10   A.    No, I did not.

11   Q.    Did you have any part in interviewing any suspects other

12   than Mr. Taylor?

13   A.    No, I did not.

14   Q.    Do you know what time -- do you remember what time Agent

15   Riedlinger asked you to witness the statement from Mr. Taylor?

16   A.    No, I do not.

17   Q.    Would it have been after 10:00 o'clock at night?

18   A.    I don't know.

19         MR. PETROVIC:  Object, your Honor.  The witness has

20   stated he does not know.

21         THE COURT:  Normally, Counsel, I would accept that.

22   However, it's cross-examination and there's more leeway in

23   cross-examination.  Overruled.

24         THE WITNESS:  I don't recall for sure, no.

25   BY MR. SCHLESINGER:

81

J. Reeder-Cross-Schlesinger

1  Q.   Do you know what time you returned to GRIT from the
2  residence?
3  A.   No, I don't.  It would have been -- without having the log
4  in front of me -- it would have been the drive time, from the
5  time that the log showed the scene was secured.
6  Q.   Did you -- is there anything -- any written record that
7  would show what time Agent Riedlinger came to you to ask you to
8  witness the statement?
9  A.   No.
10  Q.   In any event, that was your first contact with the
11  defendant?
12  A.   Yes, sir.
13  Q.   Do you know how big the room was the defendant was in?
14  A.   He was in the interview room at GRIT.  I'm not sure what
15  the dimensions are, I haven't been in there.  I since left the
16  task force area in June.
17  Q.   Well, is it 12 by 12, approximation, in your estimation?
18  A.   I guess a little on the small size, would be closer.
19  Q.   There's no windows in the room?
20  A.   No.
21  Q.   Was there a desk in the room in which the defendant was?
22  A.   Yes.
23  Q.   Was there a typewriter on the desk?
24  A.   It depends which room.  One room has a typewriter and one
25  has a computer.

1   Q.    Okay.  There are more than one interview rooms?

2   A.    Yes, sir.

3   Q.    Do you know how many there are?

4   A.    I believe there's four.

5          MR. SCHLESINGER:  I have no further questions.

6          THE COURT:  Redirect?

7          MR. PETROVIC:  Nothing further.

8          THE COURT:  You may step -- do either of you need

9   this gentleman again?

10          MR. PETROVIC:  Not me, Judge.

11          THE COURT:  Mr. Schlesinger?

12          MR. SCHLESINGER:  No, your Honor.

13          THE COURT:  You're released.  You may go home.

14          THE WITNESS:  Thank you.

15       (Witness excused.)

16          THE COURT:  Counsel, why don't I take a two or three

17   minute break.  I want to see if I can get Benson and Mr. Bauer,

18   and then I'll give you some time, if you want to have any

19   arguments.  Do you wish to have argument?

20          MR. SCHLESINGER:  Yes, your Honor.

21          THE COURT:  Okay.  I'll give you some time for

22   argument.

23          Mr. Bauer, were you able to locate him?

24          MR. BAUER:  I was informed he was on a conference

25   call, and I indicated that the Judge wanted to see him.  And so

 1    he should be here forthwith.

 2           THE COURT:  Okay.  I'll tell you what, I'm going to

 3    leave forthwith, take care of your matter, and then I'll come

 4    back to these gentlemen.

 5           THE CLERK:  All rise.

 6           THE COURT:  Marshals, it's up to you if you want to

 7    take him down.  My only concern is if we have the defendant

 8    here and we come back, then hopefully, we can get started, so

 9    you can get back to the MCC after that.  But if you feel that

10    you want to take him down, I'll let you take him down.  I

11    don't think it's going to take very long.

12           THE CLERK  Court stands in recess.

13        (Brief recess.)

14        (Back on the record.)

15           THE COURT:  Mr. Schlesinger, would you like to be

16    heard?

17           MR. SCHLESINGER:  Yes, your Honor.

18           THE COURT:  You may.

19           MR. SCHLESINGER:  Your Honor, the -- I did not file a

20    response to Mr. Petrovic's response to my original motion, and

21    I think it's basically because we're in agreement on the law.

22           THE COURT:  That's a first between counsel, but I'll

23    accept that.  Usually, they argue about even the law, but I

24    appreciate your agreeing to that.

25           MR. SCHLESINGER:  The --

84

1          THE COURT:  You give your profession some
2     credibility.
3          MR. SCHLESINGER:  Well, frankly, even if you believe
4     the defendant, you might not believe his will was over born.  I
5     think that's the ultimate issue.
6          But there are five factors the Court can consider,
7     according to the Code.  Time lapse between arrest and
8     arraignment, which is really not relevant to this period, where
9     they explained to the defendant the charges he was facing, and
10    I think that is relevant.  I believe that he was misinformed of
11    the charges.  He was actually charged with maintaining a crack
12    house, and I don't think there's any legal finding to --
13          COURT REPORTER:  Could you please slow down.
14          MR. SCHLESINGER:  I don't think there is a
15    requirement that he be informed of the specific charge;
16    however, he was misinformed in this case.  And I think that is
17    a court report.  Also, he was informed he was facing a
18    five-year minimum sentence, which I think factors -- the Court
19    needs to consider in determining whether his statement was
20    voluntary.
21          As far as the constitutional rights go --
22          THE COURT:  Do they have to charge him, counsel, with
23    what they advise him of?
24          MR. SCHLESINGER:  No, as I said -- the statute
25    requires he be informed of the nature of the charges.

85

1          THE COURT:  But what I'm saying is assuming for a

2   moment that the police officer -- and giving him the benefit of

3   the doubt for the moment -- honestly believes that he's going

4   to charge him with distributing a certain quantity of crack

5   cocaine, and as a result of that, he would have a five-year

6   minimum, mandatory minimum because of the quantity.

7          And if later on he only charges him with maintaining

8   a crack house, have you seen any cases that says he was lied to

9   or he was misinformed?

10         MR. SCHLESINGER:  No.  And he did not decide to

11  charge him with that -- obviously, agents don't have all the

12  evidence at that point.  And the specific charges --

13         THE COURT:  That's what I'm saying --

14         MR. SCHLESINGER:  Now, as his attorney --

15         THE COURT:  The prosecutorial discretion?

16         MR. SCHLESINGER:  Right.  However, what concerns me

17  more is the subversive -- the coercive effect of indicating

18  that there's a five-year minimum.  If he doesn't know what he's

19  going to charge him with, the fact that he's indicating there's

20  a five-year minimum is certainly said to him in an effort to

21  induce him to make a statement at that time.

22         On the constitutional rights, the Court has to make a

23  determination on that.  The Court heard the various evidence.

24         The last factor is whether or not the defendant --

25  counsel was present, the defendant's counsel was present when

1     this statement was taken, which clearly --

2              THE COURT:  If counsel was present?

3              MR. SCHLESINGER:  Right.  Whether he was advised of

4     right to counsel, and the last one is whether counsel was

5     actually present.  Clearly, that's what was not met.

6              The only other factor I wanted to point out was that,

7     if I understand the agents' testimony correctly, he was advised

8     of his rights at approximately 8:20 in the evening.  And there

9     was a lapse of at least two hours, it appeared, from Agent

10    Riedlinger's testimony, or any statement was written down and

11    prepared, and the Court does need to consider the time between

12    the advisement and the fact that the interrogation was

13    interrupted by the agent's admission again, whether there

14    needed to be a new advisement at that time.

15             THE COURT:  Mr. Petrovic, do you wish to be heard?

16             MR. PETROVIC:  Yes, your Honor.

17             The defendant actually was in a Superseding

18    Indictment, indicted with the possession with the intent to

19    distribute, which is a mandatory of five years.  On the

20    original Indictment he was just maintaining a place for the

21    purpose of distributing crack cocaine.

22             THE COURT:  I'm sorry, he was charged with

23    distribution?

24             MR. PETROVIC:  Yes, correct.

25             THE COURT:  Where is that at now?

1          MR. PETROVIC:  In the Superseding Indictment.

2          THE COURT:  Now?

3          MR. PETROVIC:  Yes, correct.  And, additionally, the

4     evidence in this hearing was that the defendant was a 37 year

5     old individual.  The testimony from Agent Riedlinger was that

6     he was arrested at least five previous times.

7          THE COURT:  So you're saying he's experienced?

8          MR. PETROVIC:  Yes, absolutely.  I can't see that

9     this defendant was not advised of his rights on five separate

10    occasions.

11         Additionally, under 18 USC 3501, the defendant was

12    questioned well within the six-hour time frame set by that

13    statute.  Based on the testimony of all three officers, the

14    defendant was not, based on their experience, visibly impaired.

15    In fact, after the defendant was asked whether or not he was in

16    any fashion impaired, he indicated that he took marijuana 20

17    minutes prior to the execution of the search warrant, and he

18    indicated that he was not, in fact, impaired.

19         You had two different officers indicate, both Agent

20    Riedlinger as well as Officer Lee, would indicate that this

21    defendant read over his statement, indicated that it was

22    truthful, but he was not willing to sign anything until his

23    attorney was present.

24         You also have all three officers indicate that he

25    never had a heroin withdrawal.  In fact --

88

1              THE COURT:  I thought at one point, counsel, and I'm
2    going to look at the testimony, isn't there testimony to the
3    effect that he said he had to get to a hospital?  And he said
4    we'll go to the hospital after you give a statement?
5              MR. PETROVIC:  I don't recall that testimony.
6              THE COURT:  Do you, or was I daydreaming?
7              MR. SCHLESINGER:  I think that was what the witness
8    said in his testimony.
9              MR. PETROVIC:  It could have been from the defendant,
10   one out of the three --
11             THE COURT:  I thought even one of the officers didn't
12   say exactly the same way, but gave me some reason to believe --
13             MR. PETROVIC:  We can double check the record, but
14   I'm almost positive it came from the defendant's testimony.
15             THE COURT:  At the end?
16             I think this is Taylor's testimony.  Yes.  I asked
17   about medical attention first time -- something, I can't read
18   it.  And it says "went to the hospital the next day."  Then
19   asked if I need anything.
20             I thought there was something else, though, counsel.
21             Hold on a second.
22             Okay.  The other one was the Officer Riedlinger said
23   "did not request medical attention or bring anything up
24   regarding the withdrawal of heroin."
25             MR. PETROVIC:  Additionally, your Honor, it appears

89

1    somewhat strange that Officer Riedlinger puts inside the
2    statement that the defendant admitted taking marijuana 20
3    minutes prior to the execution of the search warrant, but
4    mentions nothing about heroin, which was taken some twelve
5    hours earlier in the morning.

6          Additionally, evidence was that he was taken the
7    following day by the officers to the hospital instead of just
8    bringing him into custody to the United States Marshal and
9    having them deal with it.

10         The evidence of all three officers was that the
11   defendant never asked to use the bathroom, beverage or food and
12   was never denied any one of those three, and was in a typical
13   interview room with a desk, computer, approximately 10 by 10.

14         THE COURT:  Counsel, do you agree that there's
15   nothing in there regarding a request for a bathroom, beverages,
16   or food being denied?

17         MR. SCHLESINGER:  In the officer's testimony?

18         THE COURT:  In any of the testimony?

19         MR. SCHLESINGER:  Well, I don't believe there is any.

20         THE COURT:  That's what I'm saying, that's not an
21   issue?

22         MR. SCHLESINGER:  No.

23         THE COURT:  Any of those?

24         MR. SCHLESINGER:  No, I think that's something the
25   Court has to consider whether he had that.  But there's no

1   testimony that he asked for it.

2         THE COURT:  There's no conflicting evidence?

3         MR. SCHLESINGER:  No.

4         THE COURT:  The officers, I believe, said there was

5   no request, and I don't recall any conflicting testimony; is

6   that correct?

7         MR. SCHLESINGER:  Correct.

8         THE COURT:  Okay.

9         MR. PETROVIC:  Additionally, your Honor, and most

10  importantly, the Government's Exhibit 1, which I will tender to

11  the Court, Government's Exhibit Number 1, as witnessed by the

12  two officers, was signed by the defendant at 8:19 p.m. on May

13  5th, 1999.

14        Based on all those factors, the government's burden,

15  if the defendant does show any evidence, including such as this

16  one today is lack of contents of the evidence, which is based

17  on the quality of the circumstances.

18        Based on those three officers, listening to their

19  credibility that exists between their three stories, the

20  government feels that it did, in fact, meet that burden.  Thank

21  you.

22        THE COURT:  Mr. Schlesinger, anything else?

23        MR. SCHLESINGER:  Only that I was not aware of any

24  Superseding Indictment in this matter.  Do the Court records

25  reflect -- it doesn't have a bearing on the Court's decision,

91

1   I would just like to know if my client is facing any additional
2   charges.

3          THE COURT:  We'll find out in a second.

4          Mr. Schlesinger, you identified an Exhibit A, but you
5   never offered it.

6          MR SCHLESINGER:  Correct.

7          MR. PETROVIC:  One moment, your Honor.

8          It's the fourth defendant, and these other two
9   defendants will be superseded in the next Grand Jury, excuse
10  me.  I confused it with the fourth defendant who has a separate
11  trial, but these defendants will have two additional charges in
12  next months Grand Jury.

13         THE COURT:  Anything else from either of you?

14         MR. PETROVIC:  No, your Honor.

15         MR. SCHLESINGER:  No, your Honor.

16         THE COURT:  Counsel, what I propose to do, I'm going
17  to probably going to want to check some portion of the record
18  and go over my notes.  I will come to a decision, and as a
19  courtesy to you what I will do is call you, or have my staff
20  call you to tell you what the decision is.  I then will
21  supplement that with a written Order afterwards so that you're
22  aware what's going on and give you an oral decision.

23         Is that satisfactory?

24         MR. PETROVIC:  Yes, your Honor.

25         MR. SCHLESINGER:  Yes, your Honor.

92

1            THE COURT:  Anything else that I need to do today?

2            MR. PETROVIC:  No, your Honor.

3            THE COURT:  Marshals, take custody of the defendant.

4            THE CLERK:  All rise.  Court stands adjourned.

5         (Proceedings concluded at 5:25 p.m.)

6                    C E R T I F I C A T E

7            I, Julie A. Churchill, do hereby certify that the

8    foregoing is a complete, true and accurate transcript of the

9    proceedings had in the above-entitled case before the

10   Honorable Rudy Lozano, one of the judges of said court, at

11   Hammond, Indiana on Monday, August 30, 1999 at 3:10 p.m.

12

13   _Julie A. Churchill_              _Dec. 8, 1999_

14   Julie A. Churchill, Official Court Reporter      Date

15

16

17

18

19

20

21

22

23

24

25